**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

REBECCA HOFMANN, as Administrator :
of the Estate of Matthew L. Hofmann :
a/k/a Maddie Hofmann, deceased, :
136 Wentworth Drive :
Lansdale, PA 19446 :
                                         :
          Plaintiff, :
                                         :
          v. :
                                         :
MALVERN POLICE DEPARTMENT, :
1 E. First Avenue #1 :
Malvern, PA 19355, :
                                         :
        -   and   - :
                                         :
BOROUGH OF MALVERN, :
1 E. First Avenue :
Malvern, PA 19355, :
                                         :
        -   and   - :
                                         :
POLICE OFFICER JASON LISTMEIER, :
*in his official and individual capacity,* :
1 E. First Avenue #1 :
Malvern, PA 19355, :
                                         :
        -   and   - :
                                         :
POLICE OFFICER JOSEPH CAPUANO, :
*in his official and individual capacity,* :
1 E. First Avenue #1 :
Malvern, PA 19355, :
                                         :
        -   and   - :
                                         :
CORPORAL PATRICK M. DOUGHERTY,:
*in his official and individual capacity,* :
1 E. First Avenue #1 :
Malvern, PA 19355, :
                                         :
        -   and   - :
                                         :

JURY TRIAL DEMANDED

No.: _____

1

CHIEF LOUIS M. MARCELLI,                      :
*in his official capacity,*                   :
1 E. First Avenue #1                          :
Malvern, PA 19355,                            :
                                              :
        Defendants.                      :

## COMPLAINT – CIVIL ACTION

## PRELIMINARY STATEMENT

1.      On May 19, 2022, the life of Matthew L. Hofmann a/k/a Maddie Hofmann[1] (hereinafter "Maddie") was cut short at the hands of the Malvern Police Department (hereinafter the "Malvern PD"), when one or more officers of the Department shot and/or participated in the shooting, and killed Maddie. Police officers employed by the Borough of Malvern, including defendants Jason Listmeier (hereinafter "Officer Listmeier"), Joseph Capuano (hereinafter "Officer Capuano") and Patrick M. Dougherty (hereinafter "Corporal Dougherty") (collectively, the "Officers") were called to perform a mental health welfare check on Maddie at home, for Maddie's own safety. Despite the existence, since 2009, of a Chester County, Pennsylvania, mobile crisis unit (hereinafter the "Chester Crisis Unit"), overseen by Holcomb-Chimes Behavioral Health Systems,[2] upon information and belief, no such crisis unit was informed and/or included and/or waited for in conducting this mental health welfare check.

2.      Prior to arriving, these Officers were provided information and details that Maddie was experiencing a mental health episode; however, within minutes of encountering Maddie, they took Maddie's life by shooting and killing Maddie inside Maddie's home. Malvern PD had ample time and opportunity to assess the situation and employ appropriate tactics and accommodations recognized by nationally accepted police practices and training to peacefully resolve the situation,

---

[1] At times, this Complaint will utilize the preferred pronoun for Maddie, which was "they"; hence, "them" or "their" may be used throughout.
[2] https://www.inquirer.com/health/mental-health-mobile-crisis-units-philadelphia-20200813 html

specifically by using de-escalation techniques, communication, crisis intervention and including the Chester Crisis Unit. None of this was done.

3.      Moreover, after the Officers arrived, Maddie's precise words, "I am in a crisis situation," confirmed this mental health episode. However, none of the Officers took any of the above steps to de-escalate the situation and, as a result Defendants' wrongdoing, Maddie ended up dead.

4.      The Officers were either trained to act precisely in the manner they acted and, thus, were trained to do precisely the wrong thing, or, they acted in contravention to practice and protocol. If Officers had been properly trained in the fundamental principles of maintaining a covered position, to calmly communicate with an armed emotionally disabled person, calling in the Chester Crisis Unit, rather than hysterically screaming commands, failing to call in mental health support, and cruelly rushing after Maddie, then this tragedy would never have occurred.

5.      Moreover, Corporal Dougherty permitted the carrying out and ordering of an unreasonable and inherently risky plan that contravened Malvern PD's procedures and protocols. Had the Officers either been trained properly and/or had Corporal Dougherty properly instructed his subordinates, Officer Listmeier and Officer Capuano, to act in accordance with Malvern PD's procedures and protocols, and/or had the Officers acted in accordance with Malvern PD's procedures and protocols this tragedy would not have happened.

6.      In short, the Officers' actions during their encounter with Maddie were contrary to proper police practices for dealing with mentally disabled persons. In addition, Malvern PD's police practices, specifically by the Officers, were contrary to proper police procedures, and/or to sound police practice. Alternatively, Corporal Dougherty permitted his subordinates to act, and, himself acted, in a manner diametrically opposed to and violative of Malvern PD's procedures and

protocols. The actions taken by the Officers were of the type to increase the likelihood that this police contact would not result in a safe and peaceful self-surrender, but, instead, would result in the inevitable death of an innocent individual experiencing a mental health crisis.

7.      Corporal Dougherty, Officer Capuano, and Officer Listmeier were all inadequately trained to assist persons, like Maddie, who suffer from mental health disabilities. Malvern and Malvern PD systematically and knowingly failed to train police officers to provide appropriate services to such persons.

8.      Maddie, pictured below, was a loving parent to two minor children who can barely process their grief or understand why Maddie was killed. Maddie was also married to Rebecca. Maddie was also a sibling and a loved child to parents. Maddie was adopted from Korea and was struggling with their mental health. In the years leading up to Maddie's death, Maddie had been seeking help to address their mental health. More than that, Maddie was loving and their family reels from Maddie's death. Unfortunately, Maddie is not here to tell their own story.



9.      Accordingly, their family, and Plaintiff in Maddie's place, appropriately seeks redress, justice, change, and accountability on Maddie's behalf for violating Maddie's civil rights and the resulting atrocities which have ended Maddie's life and forever ripped apart a family.

**JURISDICTION**

10.    Plaintiff invokes jurisdiction pursuant to 28 U.S.C. § 1331 as the claims raise federal questions under 42 U.S.C. § 1983. Plaintiff further invokes supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for claims arising under state law as these claims form part of the same case and controversy as the claims brought under 42 U.S.C. § 1983.

**VENUE**

11.    Venue is appropriately laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) as it is the judicial district in which the claims asserted herein arose.

**PARTIES**

12.    Plaintiff, Rebecca Hofmann, Administrator of the Estate of Matthew L. Hofmann a/k/a Maddie Hofmann, is an adult individual and citizen of the Commonwealth of Pennsylvania. Rebecca Hofmann was appointed administrator of Matthew L. Hofmann a/k/a Maddie Hofmann's Estate with the Chester County Register of Wills.

13.    Defendant, Borough of Malvern (hereinafter "Malvern"), is a political subdivision and governmental or other jural entity, in Chester County, Pennsylvania, organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, with a principal place of business at 1 E. First Avenue, Malvern, PA 19355.

14.    The Malvern PD is the political subdivision and governmental or other jural entity organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, with a principal place of business at 1 E. First Avenue #1, Malvern, PA 19355 in Chester County, Pennsylvania.

15.     Under Malvern's authority, Malvern PD operates, and is, and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the employees of Malvern PD.

16.     Officer Capuano, at all times relevant, was and/or is employed by Malvern PD as a police officer. Officer Capuano was personally involved in the acts that deprived Maddie of Maddie's particular rights and caused Maddie's death. Officer Capuano's conduct was so closely related to the deprivation of Maddie's rights to be free from deliberate indifference to Maddie's disability under the Americans With Disabilities Act ("ADA") and to other federally and constitutionally protected rights. Officer Capuano, at all relevant times hereto, was acting under color of state law, and is sued in his individual and official capacity.

17.     Officer Listmeier, at all times relevant, was and/or is employed by Malvern PD as a police officer. Officer Listmeier was personally involved in the acts that deprived Maddie of Maddie's particular rights and caused Maddie's death. Officer Listmeier's conduct was so closely related to the deprivation of Maddie's rights to be free from deliberate indifference to Maddie's disability under the ADA and to other federally and constitutionally protected rights. Officer Listmeier, at all relevant times hereto, was acting under color of state law, and is sued in his individual and official capacity.

18.     Corporal Dougherty, at all times relevant, was and/or is employed by Malvern PD. Corporal Dougherty had obtained the rank of Corporal in the Malvern PD and was the superior officer of Officer Capuano and Officer Listmeier.

19.     Corporal Dougherty was personally involved in the acts that deprived Maddie of Maddie's particular rights and caused Maddie's death. Corporal Dougherty's conduct was so closely related to the deprivation of Maddie's rights to be free from deliberate indifference to

Maddie's disability under the ADA and to other federally and constitutionally protected rights. Corporal Dougherty, at all relevant times hereto, was acting under color of state law, and is sued in his individual and official capacity. Furthermore, Corporal Dougherty was a supervisor and, under the color of state law, directed subordinates Officer Capuano and Officer Listmeier in the acts that deprived Maddie of Maddie's particular rights and caused Maddie's death and therefore is also sued in his official capacity as a supervisory officer in the Malvern PD.

20.     Including, without limitation, failing to involve the Chester Crisis Unit, Corporal Dougherty set in motion a series of acts, or knowingly refused to terminate a series of acts by subordinates Officer Capuano and Officer Listmeier that he knew, or reasonably should have known, were objectively unreasonable, not in compliance with Municipal Police Officers' Education and Training standards and would cause the death of Maddie. Corporal Dougherty's conduct was so closely related to the deprivation of Maddie's rights to be free from deliberate indifference to Maddie's serious mental health disability as to be the moving force that caused the death of Maddie.

21.     Defendant Police Chief Louis Marcelli (hereinafter "Chief Marcelli"), at all times relevant hereto, was and/or is the Police Chief for the Malvern PD and acting under color of state law and in his authority as Police Chief of Malvern PD. Defendant Chief Marcelli is named in his official capacity as Police Chief of the Malvern PD. Additionally, Chief Marcelli was the final policymaker for Malvern PD.

22.     Chief Marcelli, as a supervisor, created, maintained, ratified, and/or allowed to persist certain policies and practices, and/or directed subordinates in the acts that deprived Maddie of Maddie's particular rights and caused Maddie's death. Chief Marcelli set in motion a series of acts, or knowingly refused to terminate a series of acts by subordinates. Further, Chief Marcelli,

knowingly and willfully, permitted untrained and inexperienced officers to carry out law enforcement duties without the proper oversight of experienced and trained superiors.

23.     Defendant Chief Marcelli knew, or reasonably should have known, the Officers' acts and omissions were objectively unreasonable, not in compliance with Municipal Police Officers' Education and Training Commission ("MPOETC") and would cause the death of Maddie.  Defendant Chief Marcelli's conduct was so closely related to the deprivation of Maddie's rights to be free from deliberate indifference to Maddie's serious mental health disability as to be the moving force that caused the death of Maddie. Defendant Chief Marcelli, at all relevant times hereto, was acting under color of state law, and is sued in his official capacity.

## **FACTS**

24.     On May 19, 2022, a call was made by ████████████████, a co-worker of Maddie, to Malvern PD.

25.     In that call, ██████ advised Malvern PD that Maddie was having mental health issues and was also in the process of transitioning from a male to a female.

26.     ██████ further advised that the purpose of the call was for Malvern PD to perform a welfare check on Maddie.

27.     Immediately upon arriving, Maddie began screaming from behind the closed door to their home.

28.     Upon opening the door, Maddie immediately and clearly advised Officers "I am in a Crisis Situation."

29.     Maddie, at said time, was in possession of a firearm.

30.     The Officers retreated, each to a protected position  and commenced speaking to Maddie. ████████████████████████████████████████████████

████████████████████████████████████.

31.     ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████.

32.     Then, as Officer Capuano began to approach Maddie, Maddie stated, "Do not touch me" and ran back into Maddie's home.

33.     However, rather than simply stand his ground in his protected position, Officer Capuano decided to give chase to Maddie and ran into Maddie's home.

34.     When Officer Capuano entered Maddie's home, he did so without either a search warrant, an arrest warrant, or exigent circumstances to permit a warrantless arrest and/or entry.

35.     Maddie had not committed any crime in the presence of the Officers.

36.     Officers were not in "hot pursuit" of Maddie.

37.     There was no risk that Maddie would destroy evidence.

38.     Maddie was not a fleeing felon.

39.     Inside the home, Officer Capuano and Maddie began grappling. Maddie's hand was on their firearm while Officer Capuano had Maddie in a restraint.

40.     At no time did Maddie point the firearm at Officer Capuano nor any other officer on scene.

41.     Within moments, Corporal Dougherty had also rushed into Maddie's home, and advised Officer Capuano to get out of the way.

42.     Corporal Dougherty made this directive despite the fact that Officer Capuano had Maddie in restraint, was behind Maddie, and was resolving the situation without use of a firearm.

43.     Corporal Dougherty's directive to get out of the way and Officer Capuano's ability to comply, thereby giving Corporal Dougherty a window to shoot Maddie, reflects that Maddie posed no imminent threat of death or serious physical injury to the Officers.

44.     Corporal Dougherty then proceeded to shoot Maddie three times – hitting Maddie in the face and the chest.

45.     At no time did Corporal Dougherty give Maddie any warning before he proceeded to fire his firearm and strike Maddie with three (3) deadly shots.

46.     Corporal Dougherty opened fire almost immediately upon entering Maddie's home.

47.     Attempts were made to save Maddie; however, those efforts would be unsuccessful.

48.     As a result, Maddie would succumb to the injuries inflicted upon them by the shots fired from Corporal Dougherty's firearm.

49.     Officer Capuano's forcible entry into Maddie's home, was a leading force in the encounter that resulted in Maddie's death.

50.     Maddie legally owned and possessed their firearm.

51.     Maddie's mere possession of a legally owned firearm did not constitute a threat of death or serious physical injury to Officer Capuano, Officer Listmeier, Corporal Dougherty, nor any other individual.

52.     Maddie's conduct leading up to Officer Capuano's forcible entry and Corporal Dougherty's unlawful use of a firearm—dropping their fireman during the police encounter, and turning their back and running away from the Officers—did not constitute a threat of death or

serious physical injury to Officer Capuano, Officer Listmeier, Corporal Dougherty, nor any other individual.

53.     Upon information and belief, Plaintiff anticipates Defendants may have engaged in spoliation of evidence, which if proven may shift Plaintiff's burden of proof with respect to some claims. ████████████████████████████████████████████████████████ ██████████████████████████████████.

54.     There are several notable inconsistencies in the Malvern PD Investigation Report and the Chester County District Attorney's Press Release which both contain inaccurate and untruthful depictions of what occurred in order to protect Defendants Malvern, Malvern PD, Corporal Dougherty, Officer Capuano, and Officer Listmeier from civil liability and potential criminal prosecution.

55.     ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████.

## FAILURE TO TRAIN POLICY

56.     Chief Marcelli is the policymaker for Malvern PD with respect to the training of Malvern PD officers.

57.     Malvern PD officers who encounter individuals who are suffering from mental illness and/or experiencing a crisis situation, are routinely put in situations that present an obvious potential for constitutional violations.

58.     Malvern PD officers who deal with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation are routinely put in situations that present an obvious potential for constitutional violations.

59.     Crisis Intervention Team (hereinafter "CIT") Training courses include training on the symptoms of mental illnesses such as schizophrenia and bipolar disorder.

60.     CIT Training teaches law enforcement and first responders how to deal with individuals with mental health illnesses or who are in a mental health crisis.[3]

61.     CIT Training is designed to help police officers recognize individuals who suffer from various mental illnesses and understand that such individuals may not have the same initial response to commands as those who do not suffer from such illnesses.

62.     CIT Training teaches police officers about ways to de-escalate intense situations with individuals suffering with mental illness.

63.     The cost of CIT Training is offset by the reduction in costs associated with wrongful death lawsuits, medical bills, and incarceration.

64.     As discussed herein, Chester County, the County that the Malvern PD is situated in, has had a crisis unit since 2009. As discussed in the Philadelphia Inquirer, the Chester Crisis Unit "receives more than 2,500 calls a month, both directly and through 911 dispatchers."[4] As also discussed in the Philadelphia Inquirer, "[the Chester Crisis Unit is] built to manage most situations without police. [] Contacting law enforcement would be a last resort, like if there needs to be an involuntary hospitalization or if there could be violence or danger."[5]

65.     Malvern PD and/or Chief Marcelli and/or Corporal Dougherty permitted a police intervention to a situation called in as a mental health wellness check, to take place without bringing in the Chester Crisis Unit and/or failing to await its arrival, and, instead taking adversarial steps that escalated the situation.

---

[3] https://www.dailylocal.com/2023/01/06/chester-countys-crisis-intervention-team-training-first-responders-police-officers-how-to-deal-with-mental-illness/
[4] https://www.inquirer.com/health/mental-health-mobile-crisis-units-philadelphia-20200813.html
[5] *Id.*

66.     Malvern PD failed to provide Officer Capuano with CIT Training.

67.     Malvern PD failed to provide Officer Listmeier with CIT Training.

68.     Malvern PD and/or Chief Marcelli and/or Corporal Dougherty permitted an officer without CIT Training, Officer Capuano, to be a lead on the encounter with Maddie.

69.     At the time of the encounter, Officer Capuano had only been a full-time officer with Malvern PD a mere eight (8) months.

70.     Malvern PD and/or Chief Marcelli and/or Corporal Dougherty permitted an officer without CIT Training, Officer Listmeier, to be a lead on the encounter with Maddie.

71.     At the time of the encounter, Officer Listmeier had been sworn in as a part-time police officer a mere two and a half (2.5) months prior.

72.     Despite the clear lack of training and experience, Malvern PD and/or Chief Marcelli and/or Corporal Dougherty, permitted Officer Listmeier to be front and center at the time of the interaction with Maddie.

73.     Making matters even more problematic is the fact that Malvern PD and/or Chief Marcelli and/or Corporal Dougherty permitted the untrained Officer Capuano to be the trainer of Officer Listmeier.

**CHESTER COUNTY CRISIS INTERVENTION**

74.     Since 2009, Chimes PA – Holcomb has operated the Chester Crisis Unit, specifically known as Chester County Crisis Services out of Valley Creek Crisis Center in Exton, Pennsylvania.

75.     The Chester Crisis Unit consists of a Mobile Crisis Response Team, which is utilized in responding to a mental health crisis situation.

76.     The Chester Crisis Unit states:

Much of the work of the organization is in tandem with the 52 local police departments across the county aimed at helping people with mental health challenges readily regain control of their lives with the right supports and/or interventions.[6]

77.     Sonja Kenney, Program Director of Crisis Services at the Chester Crisis Unit stated, "Our collaborative relationship with area police departments is critical to maintaining safety while we do our work in the field. We are mindful not to overuse police support, but we know we can count on them, and they can count on us."[7]

78.     Lavonne Alexander, Forensic Psychiatric Case Manager for Chester County Prison made this statement about the Chester Crisis Unit, "They are the mental health experts and they have assembled an amazing team of compassionate professionals. They are great to collaborate with - they do what they say they are going to do to ensure people in challenging situations get the resources they need."[8]

79.     Melanie Howson, Clinical Coordinator for Crisis Intervention at the Chester Crisis Unit stated, "We are built to manage situations without police assistance and in most cases, we send in a pair of our team members in plain, unmarked vehicles to manage the response. We don't want to draw attention to ourselves or the people we serve or have a presence that would embarrass or scare them."[9]

80.     As discussed above, while Defendants were, at all times, able to involve the readily available assistance of the Chester Crisis Unit to assist with Maddie, they failed to reach out for that assistance.

---

[6] https://chimes.org/files/2022/04/Chimes_AnnualReport-2021_2022-03-18.pdf at p. 10.
[7] *Id.*
[8] *Id.*
[9] *Id.*

81.     Because certain situations, such as the one involving Maddie, were not law enforcement intervention situations, but, instead were mental health situations—as evidenced by Maddie clearly telling Officers, "I am in a crisis situation," the Chester Crisis Unit is and would have been better equipped for responding to the situation that led to Maddie's death.

82.     Defendants, at very least Malvern PD and Chief Marcelli, and, upon information and belief, Corporal Dougherty, knew the Chester Crisis Unit was and had long been available to respond to the call made involving Maddie yet failed to take any initiative to engage the Chester Crisis Unit.

83.     Had Defendants engaged the Chester Crisis Unit, Maddie would have been alive today.

## POLICIES AND/OR CUSTOMS OF DEFENDANTS MALVERN AND MALVERN PD

84.     Post-George Floyd's 2020 death in Minnesota, a movement titled, "8 Can't Wait" began to show its presence.

85.     The "8 Can't Wait" Movement suggested the following policies to be implement by Law Enforcement Departments:

    a.     Ban Chokeholds & Strangleholds;

    b.     Require De-escalation;

    c.     Require Use of Force Continuum;

    d.     Require Exhausting All Alternatives Before Shooting;

    e.     Require Warning Before Shooting;

    f.     Ban Shooting At Moving Vehicles;

    g.     Require Comprehensive Reporting; and

    h.     Duty to Intervene.

86.     Of importance, as pertains to "De-escalation," the policy is to require officers to de-escalate situations, where possible, by communicating with subjects, maintaining distance, and otherwise eliminating the need to use force.

87.     With respect to "Use of Force Continuum," the policy is to have Law Enforcement Departments establish a Force Continuum that restricts the most severe types of force to the most extreme situations and creates clear policy restrictions on the use of each police weapon and tactic.

88.     "Require Exhausting All Alternatives Before Shooting" requires officers to exhaust all other alternatives, including non-force and less lethal force options, prior to resorting to deadly force.

89.     "Require Warning Before Shooting" requires officers to give a verbal warning in all situations before using deadly force.

90.     The Fourth Amendment prohibits the use of deadly force in non-deadly circumstances which do not pose an immediate threat of serious bodily injury and/or death.

91.     Less than a month after George Floyd's death (May 25, 2020), on June 16, 2020, at the Malvern Borough Council Meeting the "8 Can't Wait" was discussed. The minutes reflect that Mayor of Malvern and Chief Marcelli averred the following position:

    d.  Mayor Burton – Report on review of Police Department policies

        Mayor Burton provided a report on the review of the policies pertaining to the Malvern Police Department.  Mayor Burton noted that the review of the Police Department's policies and procedures has been ongoing under Chief Marcelli since 2013.  Mayor Burton stated that, in light of recent events, there is a particular focus on use of force policies, and he and Chief Marcelli are working on an extensive review of the Malvern Police Department's use of force policies.  Mayor Burton noted that the Malvern Police Department's policies are in line with the recommendations of "8 Can't Wait" and these were in place before recent events.

92.     Malvern, Malvern PD, and/or Chief Marcelli acknowledged, nearly two years prior to Maddie's death, that policies, procedures, and protocols were needed to eliminate senseless killings of civilians.

93.     Malvern, Malvern PD, and/or Chief Marcelli confirmed that such requirements were necessary and, in fact, in place, at latest in 2020.

94.     Yet, Malvern PD, Malvern, and Chief Marcelli's actions, in-practice policies and procedures betrayed their words.

95.     In fact, the actions taken by Corporal Dougherty, Officer Capuano, and Officer Listmeier were in direct contravention with those set forth in the "8 Can't Wait" Directives and in the proclamations claimed to be in place and/or effect by Malvern PD.

**CLAIMS FOR RELIEF**

**COUNT I**

**FAILURE TO TRAIN – VIOLATION OF 42 U.S.C. § 1983**
**(As Against Defendants Malvern, Malvern PD**
**Chief Marcelli, and Corporal Dougherty)**

96.     The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

97.     Defendants used excessive force, killing Maddie, who was experiencing a mental health crisis at the time of the shooting and who never attempted to strike or threaten anyone with harm, thereby depriving Maddie of their rights and liberties secured by the Fourteenth Amendment.

98.     Malvern PD and its officers routinely deal with mentally ill and/or disabled people, and persons in crisis.

99.     Malvern PD and its officers routinely deal with people who require protective care.

100.     Malvern PD and its officers have, since 2009, had access to the Chester Crisis Unit which is there to handle mental health situations.

101.     Malvern PD and its officers are subject to requirements consistent with the "8 Can't Wait" movement.

102.     Malvern PD and its officers are subject to CIT Training.

103.     Malvern PD are routinely called upon to evaluate whether to use force in situations with mentally ill people armed with deadly weapons, such evaluations are a usual and recurring situation and the need for training in such encounters is obvious.

104.     Accordingly, the use of force against Maddie arose under circumstances that constituted a usual and recurring situation and for which there are services and trainings available, and, upon information and belief, required. Malvern PD is and at all times has been on notice it must provide proper training to its officers on police tactics and procedures in dealing with armed and mentally ill persons and must discipline its officers for violations of policies and training.

105.     Malvern PD is further aware of its need to supervise, train, and discipline its officers concerning compliance with established police policies, practices and guidelines regarding interactions with armed, mentally ill and/or suicidal disabled persons.

106.     As noted in its proclamation, namely its claimed in-practice adoption of the dictates of "8 Can't Wait," Malvern PD is and has been aware that and subject to the necessary tactics and techniques are vital to prevent grave harm and/or death to citizens. If implemented, these tactics and techniques would have prevented Maddie's life from being so violently taken and cut short. Yet despite this knowledge, Malvern PD has done nothing to train its officers in such nationally accepted police tactics and techniques, to discipline them for their failures, or to hold them accountable for their gross violations of law and civil rights, despite its self-serving lofty claims

that it does – in fact – adhere to these principles, which constitutes an admission of these requirements.

107.    Malvern PD, by virtue of its addressing policing policies in general and recognition that the "8 Can't Wait" dictates should be adhered to – as early as June of 2020 – demonstrates that Malvern PD was on direct notice that there was improper training and/or lack of compliance with existing training.

108.    The adoption and ratification of "8 Can't Wait" in words by Malvern, Malvern PD, Chief Marcelli, and/or Corporal Dougherty (collectively, the "Training Defendants"), the availability of CIT and other trainings and the Chester Crisis Unit, but failure to provide proper training or do anything whatsoever to actually embrace "8 Can't Wait" principles in practice represents a policy for which these Defendants are responsible and for which they are liable.

109.    The Training Defendants, as it relates to the conduct, facts and circumstances contained herein, acted under the color of State law.

110.    The Training Defendants, including Corporal Dougherty, due to his supervisory capacity as a Corporal, had the duty to properly train Malvern PD officers.

111.    The Training Defendants' inadequate training demonstrates deliberate indifference on the part of one or more of the Training Defendants towards Maddie, and others similarly situated, with whom police officers routinely encounter.

112.    In the shooting death of Maddie, Corporal Dougherty, Officer Capuano, and Officer Listmeier either failed to follow their training or were improperly trained in how to achieve a safe and peaceful self-surrender and arrest with a mentally ill armed person.

113.    In the shooting death of Maddie, Corporal Dougherty, Officer Capuano, and Officer Listmeier acted in a reckless provocative manner by engaging in behavior they knew or should

have known would greatly heighten and/or exacerbate the anxiety of a mentally ill person and reduce their ability to comply with demands. The improper tactics used by these Corporal Dougherty, Officer Capuano, and Officer Listmeier were reckless and contrary to proper, sound, and otherwise well-established police practices for dealing with armed mentally ill / disabled persons and diametrically opposed to proper police procedures, out of synch with the rest of the police profession, and not only patently unreasonable but plainly foolish.

114.    In the shooting death of Maddie, Corporal Dougherty, Officer Capuano, and Officer Listmeier behaved in an aggressive, extreme, and outrageous manner, designed to escalate anxiety and make it impossible for Maddie to respond to demands.

115.    In the shooting death of Maddie, the reckless and improper techniques used by Corporal Dougherty, Officer Capuano, and Officer Listmeier include, but are not limited to, hysterically screaming commands, violently rushing, pursuing Maddie into their home, and physically grabbing at and wrestling Maddie. This conduct, with mentally ill persons, has long been nationally recognized as reckless, provocative, and extremely likely to minimize the chances of a safe and peaceful self-surrender and increase the chances of death. This conduct, long rejected by police departments nationwide as out of synch with good police practices, is recognized to likely result in death to officers and the individual.

116.    In the shooting death of Maddie, Corporal Dougherty's own actions reflect a failure in training and supervision since he acted in a manner consistent with Officer Capuano, and Officer Listmeier, and, in fact was the person who shot Maddie almost immediately upon entering Maddie's home.

117.    Well known, nationally accepted police practices in dealing with mentally ill, armed persons is to not agitate or excite such persons, but rather to contain them, identify and

respect their comfort zone, use nonthreatening communications to de-escalate the situation and allow the passage of time to defuse and de-escalate the situation, allowing for a safe and peaceful self-surrender.

118.    By contrast, Malvern PD trained these Officers to leave cover and rush recklessly towards an armed mentally ill person with the intent to grab them, yelling commands and barking orders over each other, and doing everything possible in a hysterical frenzy to maximize anxiety and fear, placing any subject in such a situation in a state of pure chaos. The facts and circumstances of this case, including the tenure of the junior Officers, the lack of CIT training, the lack of training to involve the Chester Crisis Unit, and carrying out activity in complete contravention to the 8 Can't Wait standards, demonstrate that Malvern PD encourages such conduct, when it knows or reasonably should know, that such conduct will make it impossible for mentally ill persons to feel comfortable or safe.

119.    MPOETC teaches officers how to recognize symptoms of mental illness and respond to people demonstrating those symptoms without escalating a potentially dangerous situation.

120.    In the Fall 2022, Malvern Borough Newsletter, Chief Marcelli stated:

All of our officers, both full time and part-time are required to attend trainings throughout the year.  All officers are trained annually by MPOETC (Municipal Police Officer Education and Training Commission) in order to maintain their certification. In addition to the Legal Updates they receive, MPOETC also requires mandatory handgun training once a year; however, our officers have mandatory handgun training twice a year.  MPOTEC also requires CPR/First Aid every two years, our Chief requires mandatory yearly training.  In addition to the mandatory training, our officers have attended recent trainings in De-escalation, Controlled Force Instruction, Basic Collision Investigation, Controlled Tactics, Traffic Law Expert, Field Training Officer course, and Taser Training.   Our department also coordinates training exercises with surrounding agencies in simulation training for critical situations.  Training with these agencies also reinforces the working relationship we have with other jurisdictions.

121.    As acknowledged by Chief Marcelli, Corporal Dougherty, Officer Capuano, and Officer Listmeier were all trained through MPOETC. If this training actually happened, Corporal

Dougherty, Officer Capuano, and Officer Listmeier at all times knew, and were taught at / through MPOETC that loud, aggressive, belligerent, and frenzied screaming at a mentally ill, armed person will make it impossible to achieve a safe and peaceful self-surrender of such person. They further knew the proper tactics for de-escalation and completely disregarded them.  If they did not, the Training Defendants continued in their pattern of failure with their training failing to align with the touted claims to the public.

122.    Prior to ever encountering Maddie, Corporal Dougherty, Officer Capuano, and Officer Listmeier knew that Maddie was experiencing a mental health crisis, as this was the sole reason they were making the welfare check. And because of this knowledge, it was imperative that Corporal Dougherty, Officer Capuano, and Officer Listmeier do nothing to increase Maddie's stress level or make Maddie feel threatened or unsafe, states of mind which they knew or should have known would interfere with Maddie's ability to understand and/or comply with directives or achieve a safe and peaceful self-surrender.

123.    It was also incumbent on them, to the extent it had not happened previously, that they contact the Chester Crisis Unit and involve them.

124.    Because Corporal Dougherty, Officer Capuano, and Officer Listmeier knew Maddie was experiencing a mental health crisis – both from the call received to dispatch advising of same as well as Maddie's explicitly informing the Officers of the crisis they were enduring immediately upon the initial encounter – they knew or should have known, it was imperative to keep their distance, not consistently scream at Maddie nor to chase Maddie into their home, and should have worked to calm Maddie down, and de-escalate the situation to achieve a safe and peaceful self-surrender.

125.   Because Corporal Dougherty, Officer Capuano, and Officer Listmeier knew Maddie was experiencing a mental health crisis – both from the call received to dispatch advising of such as well as Maddie's explicitly informing the Officers of the crisis they were enduring immediately upon the initial encounter – the Officers knew or should have known it was imperative at all times to talk slowly and clearly in an even tone of voice to de-escalate the situation and try to make Maddie feel comfortable in order to achieve a safe and peaceful self-surrender.

126.   Contrary to proper training Corporal Dougherty, Officer Capuano, and Officer Listmeier all engaged in frantic screaming at Maddie, a tactic guaranteed to escalate Maddie's anxiety and make their peaceful self-surrender impossible; all such officer actions were completely unnecessary under the circumstances. This contrary approach led Maddie to feel, frightened, threatened, and unsafe.  Maddie explicitly exclaimed to all the officers that the Officers' actions caused them to fear for their life, demonstrated in Maddie's attempt to flee into their home for safety.

127.   Contrary to proper training Officer Capuano, rushed to chase after Maddie into their home, a tactic guaranteed to escalate Maddie's anxiety and make their peaceful self-surrender impossible.

128.   Contrary to proper training Corporal Dougherty, rushed and chased after Maddie into their home, into a situation where Officer Capuano was in relative control, such that he could heed a directive to get out of the way, and discharged his firearm almost immediately after coming through the door.

129.   Upon information and belief, Corporal Dougherty, Officer Capuano, and Officer Listmeier did not comply with CIT techniques, the Chester Crisis Unit protocols, 8 Can't Wait standards, MPOETC training, or accepted police practice in a mental health situation.

130.     Corporal Dougherty, Officer Capuano, and Officer Listmeier should have been trained and/or were trained but failed to do the following:

    a.     When receiving a call related mental health, bringing in the Chester Crisis Unit to attempt to de-escalate;

    b.     Immediately initiate a tactical plan to contain Maddie, reduce their anxiety level, and achieve a safe and peaceful self-surrender;

    c.     Take cover behind their police cars, trees or dumpster or other available safe zones in the perimeter of Maddie's home and communicate with Maddie from a safe position without aggressive and/or loud demonstrative movements and chasing that could provoke a violent response or increase Maddie's anxiety level;

    d.     Initiate a dialogue with Maddie, talking in a low conciliatory voice to lessen their anxiety, saying things such as: They were there to help, Maddie was not in trouble, everything would be okay, and using an on the scene officer as a negotiator;

    e.     Once a dialogue had been initiated, begin to issue instructions such as: "This is the way we are going to resolve this, here is how we are going to get you out of this," complimenting Maddie after compliance with instructions while emphasizing to Maddie they were "not in trouble";

    f.     Utilize verbal tactics to de-escalate the situation;

    g.     Call for and engage a trained crisis intervention person to aid in the situation;

    h.     Utilize Maddie's family by phone and in person to urge Maddie to get peacefully out of the house;

    i.      Utilize less-lethal means such as tear gas, tasers, and / or beanbag rounds;

    j.      Utilize a public address system to communicate slowly and clearly to Maddie while maintaining a safe distance and cover; and/or

    k.      Utilize time, remaining in a safe covered position while attempting to talk with Maddie in a manner designed to lessen their anxiety and lead Maddie to reasonably believe they would be safe and could peacefully self-surrender.

131.    Rather than employing or attempting to employ any or all of the foregoing, in less than sixty (60) seconds of their first encounter with Maddie, Corporal Dougherty, shot and killed Maddie, shooting Maddie three times. Within sixty (60) seconds from the initial encounter, Corporal Dougherty, Officer Capuano, and Officer Listmeier turned a mental health, welfare check into a violent, gruesome scene where Maddie's life was taken.

132.    Corporal Dougherty's frenzied handling of the chaotic situation put in motion by Officer Capuano was further exacerbated by Corporal Dougherty's egregiously reckless and rash decision to shoot Maddie three times.

133.    Quite obviously, the training and/or supervision was inadequate for the task performed, that being a wellness check on Maddie.

134.    As evidenced by Malvern, Malvern PD and Chief Marcelli saying all the right things, both about 8 Can't Wait standards and MPOETC training to the public, the failure to train including, without limitation, to provide CIT Training and/or to call upon the Chester Crisis Unit, reflects a deliberate indifference on the part of the Training Defendants.

135.    Malvern PD's failure to train and supervise Corporal Dougherty, Officer Capuano, and Officer Listmeier as well as Corporal Dougherty's failure to properly supervise Officer

Capuano and Officer Listmeier, caused the death of Maddie and was and is at all times the sole proximate cause of Maddie's death.

136.   As a direct and proximate result of Malvern PD and the Officer's failures, Maddie experienced extreme physical pain, severe emotional distress, mental anguish, needless suffering including asphyxiation and eventual death during their interactions with Corporal Dougherty, Officer Capuano, and Officer Listmeier.

137.   Maddie had a constitutionally protected right to be free from unlawful search and seizure and from the use of excessive and unreasonable force under the Fourth Amendment, from violations of the ADA, and from discriminatory treatment of a protected class of which disability is one.

138.   The conduct alleged herein was done in reckless disregard of Maddie's constitutionally protected rights; justifying an award of punitive damages as against the individually named Defendants. Malvern PD's failure to train Corporal Dougherty, Officer Capuano, and Officer Listmeier, resulted in the intentional, reckless, and callous disregard for Maddie's life and their constitutional rights. The actions of Corporal Dougherty, Officer Capuano, and Officer Listmeier were willful, wanton, oppressive, malicious, and unconscionable to any rational or reasonable person of normal sensibilities.

139.   By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiff was caused to incur funeral and/or related cremation expenses.

140.   By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiff has suffered loss of love, companionship, affection, comfort, care, and society.

141.   Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages.

142.    Plaintiff seeks wrongful death and survival damages under this claim.

143.    Plaintiff is also entitled to and seeks statutory attorney fees and costs under this claim. 42 U.S.C. § 1988.

## COUNT II

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(As Against All Defendants)**

144.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

145.    The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

146.    Title II of the ADA provides: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. *Id.*; 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. To be a qualified individual with a disability a person must suffer from a physical or mental impairment that substantially limits that person's ability to perform a major life activity – an activity that the average person in the general population can perform.

147.    Title II of the ADA includes an affirmative obligation that public entities must make accommodations to people with disabilities.

148.    Title II of the ADA mandates a public entity may be liable for damages under Title II of the ADA if it intentionally or with deliberate indifference fails to provide a reasonable accommodation to a disabled person. The failure to provide reasonable accommodation constitutes

discrimination against the disabled person. A public entity may not disregard the plight and distress of a disabled person by failing to accommodate his, her, of their needs.

149.   Title II of the ADA mandates that once an entity is on notice of the need for accommodation, it is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.

150.   Title II of the ADA applies to Malvern PD because it is a public entity.

151.   Title II of the ADA applies to police departments.

152.   Title II of the ADA requires Malvern PD to train its officers in how to deal with physically and mentally disabled individuals.

153.   Title II of the ADA mandates that government agencies, including police officers, must take a disabled person's disability into account by making reasonable modifications of policies and practices where needed to avoid discrimination. 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(7).

154.   Maddie was diagnosed major depressive disorder. This mental disability continued throughout their life.

155.   Maddie's major depressive disorder and other forms of mental illness are recognized impairments for purposes of the ADA.

156.   Maddie was disabled under the ADA because their mental illness substantially limited their ability to interact with others.

157.   Based upon the foregoing, Maddie's mental disability was at all times known to Malvern PD and Corporal Dougherty, Officer Capuano, and Officer Listmeier. These Defendants either failed to follow Malvern PD training on the accommodation of individuals with mental disabilities or were improperly trained.

158.    Corporal Dougherty, Officer Capuano, and Officer Listmeier knew or should have known, Maddie was experiencing a mental health crisis. Corporal Dougherty, Officer Capuano, and Officer Listmeier should have known how to accommodate Maddie's mental illness by calling in the Chester Crisis Unit, utilizing de-escalation techniques with the goal of achieving a safe and peaceful self-surrender. Yet despite this knowledge, and the national mandate to accommodate the disabled, Corporal Dougherty, Officer Capuano, and Officer Listmeier chose to utilize the worst possible police tactics that made a safe and peaceful self-surrender impossible.

159.    Corporal Dougherty, Officer Capuano, and Officer Listmeier engaged in techniques nationally understood to exacerbate and amplify stress and anxiety in the mentally ill. Such practices have long been rejected by police departments when interacting with the mentally ill. Such practices make it impossible for mentally ill persons to understand and/or to comply with directives and commands and are guaranteed to make a safe and peaceful self-surrender impossible.

160.    Corporal Dougherty, Officer Capuano, and Officer Listmeier could have reasonably accommodated Maddie by respecting Maddie's comfort zone, engaging in non-threatening communications, and using the passage of time to defuse the situation rather than precipitating a deadly confrontation with a pursuit and a physical attack.

161.    Corporal Dougherty, Officer Capuano, and Officer Listmeier had the time and opportunity to assess the situation and provide for a plan to render appropriate accommodations including, without limitation, engaging the Chester Crisis Unit, because Maddie was contained in the home and could not escape.

162.    At all times during Corporal Dougherty, Officer Capuano, and Officer Listmeier's interactions with Maddie, accommodation was possible. Even when an emotionally disturbed

individual is acting out and inviting officers to use deadly force to subdue said person, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed any crime, but with a mentally ill person who needs and requires accommodation for their disability.

163.    At all times during Corporal Dougherty, Officer Capuano, and Officer Listmeier's interactions with Maddie, they were on notice that because of Maddie's disability, they were required to make a greater effort to take control of the situation through less intrusive means.

164.    By failing to accommodate Maddie's mental health disability, Corporal Dougherty, Officer Capuano, and Officer Listmeier acted with discriminatory intent and deliberate indifference to Maddie's federally protected rights.

165.    The conduct alleged herein was done in reckless disregard of Maddie's constitutionally protected rights; justifying an award of punitive damages as against the individually named Defendants.

166.    By reason of the aforementioned acts and omissions, Plaintiff was caused to incur funeral and related cremation expenses.

167.    By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiff has suffered loss of love, companionship, affection, comfort, care, and society.

168.    Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages in an amount according to proof at trial.

169.    Plaintiff seeks wrongful death and survival damages under this claim.

170.    Plaintiff is also entitled to and seeks statutory attorney fees and costs under this claim.

## COUNT III

### *MONELL* CLAIM – MUNICIPAL LIABILITY – RATIFICATION
### (As against Malvern, Malvern PD, and Chief Marcelli)

171.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

172.    A ratification theory may be established in two ways: 1) based on a "pattern" of ratification that constitutes a practice or custom, or (2) based on a single act by an official with policy making authority. On information and belief Malvern PD ratified the excessive actions of the Officers in the shooting death of Maddie.

173.    Policymakers for Malvern, including but not limited to Malvern's Mayor David B. Burton, have vigorously defended the Borough's police officers for the shooting death of Maddie.

174.    Upon information and belief, the policymaker at Malvern PD, Chief Marcelli, has approved and defended the Officers in their conduct in the shooting death of Maddie.

175.    Upon information and belief, the policymakers at Malvern and Malvern PD, Chief Marcelli and Mayor David B. Burton have a custom and practice of asserting, in the public sphere, certain standards of practice, but in actuality, permitting and ratifying the actual pattern and custom of inadequate training or utilization of the Chester Crisis Unit.

176.    Upon information and belief, the policymaker at Malvern PD, Chief Marcelli, has a custom and practice of failing and/or refusing to terminate and/or discipline officers involved in officer involved shooting and excessive force cases and/or who otherwise demonstrate patterns of misconduct.

177.    Upon information and belief, an officer like Corporal Dougherty, who openly admits that he was just waiting for a clear shot when he was in cover and opens fire almost

immediately upon entering a home, is precisely the type of reckless and dangerous officer that he was encouraged and/or trained to be by Malvern and/or Malvern PD and/or Chief Marcelli.

178.    Upon information and belief, the policymaker at Malvern PD, Chief Marcelli, has a custom and practice of improperly justifying shootings that are in fact unjustifiable.

179.    Upon information and belief, the policymaker at Malvern PD, Chief Marcelli, has failed to thoroughly investigate the officer involved shooting of Maddie and has a custom and practice of failing to take remedial steps after an officer involved shooting, such as that involving the shooting death of Maddie.

180.    Upon information and belief, Malvern and Malvern PD have ratified, condoned, approved, and encouraged the excessive use of force by its officers including but not limited to officer involved shootings, such as that involving the shooting death of Maddie.

181.    Malvern was deliberately indifferent to the rights of Maddie to be free from, and protected from, the deliberate indifference and misconduct of its employees.

182.    As a direct result of Malvern's longstanding customs and practice of deliberate indifference to the constitutional rights of disabled persons, a protected class, to have a safe and peaceful self-surrender, it was deliberately indifferent to a substantial risk of serious harm to Maddie.

183.    As a direct result of Malvern's longstanding customs and practice of deliberate indifference to the constitutional rights of disabled persons to be accommodated by officers with a plan to de-escalate the situation with Maddie so as to have a safe and peaceful self-surrender, it was deliberately indifferent to a substantial risk of serious harm to Maddie.

184.    The unlawful and illegal conduct of Malvern, its policies, procedures, customs, and practices, deprived Maddie of the rights, privileges, and immunities secured to Maddie by the Constitution of the United States and federal statutory law.

185.    Malvern, Malvern PD, and/or Chief Marcelli had the power to terminate and/or appropriately discipline Corporal Dougherty, Officer Capuano, and/or Officer Listmeier for their misconduct as complained of herein, but failed to do so despite the egregiousness of these transgressions.

186.    By refusing to terminate and/or appropriately discipline Corporal Dougherty, Officer Capuano, and/or Officer Listmeier, Malvern, Malvern PD, and/or Chief Marcelli caused the Officers to act with impunity and without fear of retribution.

187.    Malvern, Malvern PD, and/or Chief Marcelli's failure to terminate and/or appropriately discipline Corporal Dougherty, Officer Capuano, and/or Officer Listmeier for their misconduct as complained of herein, is part of its larger custom, policy and/or practice of failing to supervise, terminate and/or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct.

188.    As a direct, proximate, and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

189.    By reason of the aforementioned acts and omissions, Plaintiff was caused to incur funeral and related cremation expenses.

190.    By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiff has suffered loss of love, companionship, affection, comfort, care, and society.

191.    Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages.

192.    Plaintiff seeks wrongful death and survival damages under this claim.

193.    Plaintiff also seeks statutory attorney fees and costs under this claim.

## COUNT IV

### 42 U.S.C. § 1983 AND FOURTH AMENDMENT VIOLATIONS –
### Unlawful Seizure and Excessive Force
### (As Against Corporal Dougherty, Officer Capuano, and Officer Listmeier)

194.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

195.    At all material times, Corporal Dougherty, Officer Capuano, and Officer Listmeier were each acting under color of state law, as agents of Malvern, and, subject to the conduct complained of herein, were acting within the scope of their employment and authority as certified law enforcement officers of Malvern.

196.    At all material times, Corporal Dougherty was acting in a supervisory capacity as a superior officer and directly participated in violating Maddie's federal rights.  Therefore, Corporal Dougherty is liable in both his individual and supervisory capacities.

197.    Maddie was committing no crime at the time Corporal Dougherty, Officer Capuano, and Officer Listmeier encountered them, nor was Maddie being accused of the commission of any crime.

198.    And even after the first encounter with Corporal Dougherty, Officer Capuano, and Officer Listmeier and through to the moment that Maddie was shot by Corporal Dougherty, Maddie continued to commit no crime.

199.    At the point in which Maddie fled back into their home, Maddie did not pose a threat to Corporal Dougherty, Officer Capuano, or Officer Listmeier's safety nor did they nor

could they have a reasonable belief that they or any other person was in danger of imminent bodily harm from Maddie.

200.    And even after Officer Capuano – unthinkingly – ran in pursuit of Maddie, unlawfully entered Maddie's home, and attempted to restrain Maddie, the firearm, which was lawfully possessed by Maddie inside their home, remained pointed at the ground.

201.    Corporal Dougherty, Officer Capuano, and Officer Listmeier's unlawful entry and sadistic use of force was in bad faith, inflicted to cause pain, and for the purpose of causing harm.

202.    Defendants Corporal Dougherty, Officer Capuano, and Officer Listmeier may not kill persons who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.

203.    In fact, in this case, this is exemplified by the fact that Officer Capuano, though he was violating Maddie's rights at the time, as it constituted an unlawful seizure, was succeeding in subduing Maddie without the use of deadly force.

204.    Corporal Dougherty, Officer Capuano, and Officer Listmeier failed to give Maddie a warning that failure to comply with commands would result in the use of deadly force.

205.    Corporal Dougherty, Officer Capuano, and Officer Listmeier were required to consider what other tactics, if any, were available and if there were clear, reasonable, and less intrusive alternatives to force.

206.    The shooting of a mentally ill individual without attempting less intrusive means constitutes the unreasonable use of force. Defendants Corporal Dougherty, Officer Capuano, and Officer Listmeier at all times had a duty to act reasonably when using deadly force.

207.    Instead, Corporal Dougherty expressed a desire to get a clean shot on Maddie, and when he did, almost immediately after unlawfully entering Maddie's home, he shot Maddie three times after instructing Officer Capuano to move (which he did and was able to do).

208.    Corporal Dougherty, Officer Capuano, and Officer Listmeier's decision to force an entry into Maddie's home was in effect a decision to cause a violent and potentially deadly confrontation with a mentally ill person without a countervailing need.

209.    Because Corporal Dougherty, Officer Capuano, and Officer Listmeier were on notice that Maddie was a mentally ill person and experiencing a mental health crisis, they were required to make a greater effort to take control of the situation through less intrusive means.

210.    Defendants Corporal Dougherty, Officer Capuano, and Officer Listmeier were required to take Maddie's mental health into account when considering the appropriate amount of force to be expended.

211.    Even in a situation where an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, her, or them, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a crime against others but with a mentally ill individual intent on doing harm only to himself, herself, or themselves.

212.    Upon information and belief, Defendants Corporal Dougherty, Officer Capuano, and/or Officer Listmeier were armed with tasers, batons, and/or pepper spray. Defendants Corporal Dougherty, Officer Capuano, and Officer Listmeier had Maddie confined to the home, had Maddie contained, and had established defensive cover using police vehicles and trees and were not in any danger. All Defendants Corporal Dougherty, Officer Capuano, and/or Officer Listmeier needed to

do was use time to de-escalate the situation, working with Maddie to safely and peacefully self-surrender.

213.    Moreover, the Officers had the opportunity, while under the safety of cover, to bring in the Chester Crisis Unit to assist in de-escalating.

214.    Defendants Corporal Dougherty, Officer Capuano, and/or Officer Listmeier had no time limit and could have created a perimeter, assembled additional less lethal means, coordinated a plan for the use of force, established cover, brought in a trained crisis intervention person, and/or communicated with Maddie to de-escalate Maddie's anxiety and urge a safe and peaceful self-surrender.

215.    By the actions described above, Defendants Corporal Dougherty, Officer Capuano, and/or Officer Listmeier deprived Maddie of the well-settled constitutional right to be free from the use of excessive and unreasonable force under the Fourth Amendment.

216.    The right to be free from non-trivial force where there was no officer safety risk, no attempt to escape from the home, no criminal action whatsoever, was clearly established. Under these circumstances, the law is clearly established that any degree of force was unconstitutional.

217.    In horrific contravention thereto, they used deadly force.

218.    Defendants Corporal Dougherty, Officer Capuano, and/or Officer Listmeier acted together, jointly, collectively, and in concert, as integral participants, thereby ratifying, approving, and authorizing all actions of each to the other. The officers, and each of them, had a duty to intervene when their fellow officers violate the constitutional rights of a suspect or other citizen. An officer who fails to intervene when a fellow officer uses excessive force would be responsible, just as the offending fellow officer, for violating the Fourth Amendment's requirement that police may use only such force as is objectively reasonable under the circumstances.

219.    The use of deadly force was excessive and unreasonable under the circumstances and violated established law, especially since Maddie was mentally disabled when they were fatally shot, and posed no imminent threat of death or serious physical injury to Corporal Dougherty, Officer Capuano, and/or Officer Listmeier.

220.    Corporal Dougherty, Officer Capuano, and/or Officer Listmeier actions thus deprived Maddie of their right to be free from excessive force under the Fourth Amendment.

221.    As a result of Corporal Dougherty, Officer Capuano, and/or Officer Listmeier's unjustified, excessive, illegal, and deadly use of force, Maddie experienced pain and suffering.

222.    As a result of Corporal Dougherty, Officer Capuano, and/or Officer Listmeier's unjustified, excessive, illegal, and deadly use of force, Maddie died.

223.    In addition to these uses of unjustified, excessive, illegal, and deadly uses of force, each of the Officers had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another officer.

224.    Upon information and belief, Corporal Dougherty and Officer Listmeier recognized Officer Capuano's entry into Maddie's home as a violation, were in a position to intervene and did nothing.

225.    The conduct of Corporal Dougherty, Officer Capuano, and Officer Listmeier was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Maddie and therefore warrants the imposition of exemplary and punitive damages as to the individually named Defendants only.

226.    Plaintiff brings this claim in a representative capacity as the Administrator of Maddie's Estate and seeks both survival and wrongful death damages for the violation of Maddie's rights.

227.    Plaintiff also seeks attorney's fees under this claim.

## COUNT V

**SUPERVISOR LIABILITY – VIOLATION OF 42 U.S.C. § 1983**
**(As Against Corporal Dougherty)**

228.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

229.    Corporal Dougherty, as a corporal, was a supervisor. Corporal Dougherty at all times possessed the authority to restrain, control, and supervise the actions of his subordinates.

230.    Corporal Dougherty personally participated in the constitutional violation of Maddie's constitutional rights, was present when the unlawful acts transpired, and was the individual who fired the fatal shots that killed Maddie.

231.    Corporal Dougherty acquiesced in and/or ratified and/or supported the unconstitutional conduct of his officers and knowingly refused to terminate a series of acts by his subordinates, which he knew or reasonably should have known, would cause others to inflict the constitutional injuries alleged herein.

232.    Corporal Dougherty knew or reasonably should have known that his subordinates were engaging in acts that deprived Maddie of their constitutional and federal statutory rights and failed to prevent his subordinates from engaging in such conduct.

233.    Corporal Dougherty's personal acts and his failure to supervise subordinates, caused Maddie to be deprived of their rights under the laws of the United States.

234.    Corporal Dougherty knew of the constitutional violations perpetrated against Maddie and acquiesced in the unconstitutional conduct by his subordinates.

235.    Corporal Dougherty disregarded the known or obvious consequences of his subordinates' actions in all of their interactions with Maddie, including but not limited to: leaving

cover, yelling, chasing after Maddie and pursuing Maddie into the home, and all actions leading up to the shooting death of Maddie. Corporal Dougherty knew or should have known that these police practices were guaranteed to raise Maddie's stress and anxiety level because of Maddie's severe mental illness, making it impossible for Maddie to follow police commands. Further, Corporal Dougherty was either unaware, or deliberately indifferent, to nationally recognized standards.

236.    Corporal Dougherty's conduct was so closely related to the deprivation of Maddie's rights as to be the moving force that caused Maddie's injury and death.

237.    Corporal Dougherty was deliberately indifferent to the deprivation of Maddie's constitutional rights. For example, Corporal Dougherty's failures are evident in that he allowed inexperienced Officers – Officer Capuano and Officer Listmeier, who's total service to the Malvern PD was under one year – to be the sole individuals to approach and interact with Maddie.

238.    Corporal Dougherty allowed Officer Capuano and Officer Listmeier to interact with Maddie – who it was known prior to attempting to make contact with Maddie – was experiencing a mental health crisis.

239.    Corporal Dougherty knew that Officer Capuano and Officer Listmeier lacked the training, qualifications, and experience to handle a mental health, welfare check appropriate; yet, acquiesced and permitted both of them to take lead, while he sat back in the distance.

240.    As a direct and proximate result of the aforementioned willful and unlawful conduct by Corporal Dougherty, committed under color of law and under his police authority, Maddie suffered substantial physical pain, emotional distress, and death.

241.     The conduct alleged herein caused Maddie to be deprived of their civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably, and actually caused Maddie to suffer emotional distress, pain, and death.

242.     The conduct alleged herein was done in deliberate or reckless disregard of Maddie's constitutionally protected rights; justifying the award of punitive damages against the individually named Defendants.

## COUNT VII
### WRONGFUL DEATH (State Claim)
### (As Against All Defendants)

243.     The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

244.     Based upon the acts and omissions contained herein, Plaintiff hereby brings Wrongful Death claims pursuant to 42 Pa. C.S. § 8301 (the Pennsylvania Wrongful Death Statute) on behalf of all those persons entitled by law to recover damages as a result of the wrongful death of Matthew L. Hofmann a/k/a Maddie Hofmann.

245.     The only person legally entitled to recover under the Wrongful Death Statue is Maddie's wife, Administrator Rebecca Hofmann, who resides in Montgomery County, Pennsylvania.

246.     No other action has been brought to recover for Maddie's death under the aforementioned statute.

247.     Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that Maddie would have rendered to the wrongful death beneficiary but for their traumatic, untimely, and unnatural death.

248.   Plaintiff claims damages for payment for all medical bills and/or expenses.

249.   Plaintiff claims damages for payment of funeral and burial expenses.

## COUNT VII

### SURVIVAL ACTION (State Claim)
### (As Against All Defendants)

250.   Based upon the acts and omissions contained herein, Based upon the acts and omissions contained herein, Plaintiff also brings a Survival Action under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, and pursuant to 42 Pa. C.S. § 3373, for all damages recoverable under the Statute, including but not limited to, loss of income as well as Maddie's nightmarish and agonizing pain and suffering prior to death, and for the extreme emotional distress suffered by Maddie from the initial impact of the three bullets entering their body to the time of their death.

## COUNT VIII

### ASSAULT AND BATTERY (State Claim)
### (As Against Corporal Dougherty)

251.   The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

252.   The acts and conduct of Defendant Corporal Dougherty were intended to put or did recklessly place Maddie in fear of bodily injury, and Maddie, as a result of Defendant Corporal Dougherty's acts, was placed in fear of serious bodily injury.

253.   Prior to being shot by Defendant Corporal Dougherty, Maddie audibly disclosed to all officers including Defendant Corporal Dougherty that they feared for their life.

254.   As a result of being shot by Defendant Corporal Dougherty, Maddie sustained catastrophic physical injuries.

255.    The acts and conduct of Defendant Corporal Dougherty constitute assault and battery.

256.    The acts and conduct of Defendant Corporal Dougherty were willful and wanton in violation of Maddie's rights.

257.    Plaintiff claims the full measure of damages allowed under the Pennsylvania common law and the Pennsylvania Wrongful Death Act.

258.    Wherefore, Plaintiff requests the following relief:

    a.    an award of compensatory damages against Defendants Malvern, Malvern PD, and Corporal Dougherty, jointly and severally; and

    b.    an award of punitive damages against Defendant Corporal Dougherty.

## JURY DEMAND

Plaintiff demands a jury determination of all issues so triable.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff asks the Court to:

    a.    Enter judgment in her favor, as against all Defendants;

    b.    Award her compensatory damages against all Defendants including but not limited to pain and suffering, loss of life's pleasures, disfigurement, emotional distress, loss of past and future wages, past and future medical bills/costs, and all damages permitted under Pennsylvania's Survival and Wrongful Death Acts;

    c.    Award exemplary and punitive damages against all Defendants;

    d.    Award such interest as the law permits;

    e.    Award Plaintiff attorney fees and costs pursuant to 42 U.S.C. § 1988; and

     f.    Provide Plaintiff with such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**FARBER SCHNEIDER FERRARI LLP**

Dated: <u>November 13, 2023</u>

By: <u>*/s/ Howard Balsam*</u>
Howard Balsam, Esq.
Attorney ID No. 333000
Michael Farber (subject to *pro hac vice* admission)
Sarena Townsend (subject to *pro hac vice* admission)
Daniel Schneider (subject to *pro hac vice* admission)
261 Madison Avenue, 26th Floor
New York, New York 10016
212-972-7040
Fax: 212-922-1939
hbalsam@fsfllp.com
mfarber@fsfllp.com
stownsend@fsfllp.com
dschneider@fsfllp.com
*Co-Counsel for Plaintiff*

**TOWN LAW LLC**

By: <u>*/s/ Ian V. Gallo*</u>
Ian V. Gallo, Esq.
Attorney ID No. 320758
1650 Market Street, Suite 3669
Philadelphia, PA 19103
917-974-6091
Fax: 610-813-4944
igallo@thetownlaw.com
*Co-Counsel for Plaintiff*