**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REBECCA HOFMANN,** | : | |
| | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **BOROUGH OF MALVERN, *et al.*** | : | **NO. 23-4450** |
| | : | |
| Defendants. | : | |

**Perez, J.** **October 19, 2026**

**MEMORANDUM**

This case arises from a police welfare check that escalated within minutes to a fatal shooting. On May 19, 2022, Malvern Borough Police Officer Joseph Capuano, Officer Jason Listmeier, and Corporal Patrick Dougherty responded to Hofmann's home after dispatch reported that Hofmann might be experiencing a mental health crisis and had posted a goodbye message on social media. The call was for a welfare check, not the investigation of a reported crime, and the officers had received no information that Hofmann possessed a firearm. Much of what followed was captured on the officers' body-worn cameras. Joint Statement of Material Facts ("JS") ¶¶ 1–5.

When Hofmann opened the door holding a handgun, the officers withdrew to positions of cover outside the residence and continued speaking with her from a distance. For a brief period, the encounter appeared to be moving toward resolution. Hofmann placed the gun inside the house, came outside without a visible weapon, and increased the distance between herself and the firearm. JS ¶¶ 18–26. Capuano holstered his own gun and no longer regarded Hofmann as an immediate threat, while Dougherty believed the officers had reached a point where they could continue through conversation rather than force.

The situation changed again within seconds. As the officers moved toward her, Hofmann said, "do not touch me," pivoted, and moved back toward the residence, where the firearm remained. Capuano believed she was returning for the gun and immediately followed. As Capuano closed the distance, Hofmann reached toward the area where she had left the firearm and regained possession of it. Capuano made physical contact from behind, and the two fell into a struggle near the foot of the stairs, with Capuano attempting to control Hofmann's right wrist or forearm and the gun. Dougherty approached the doorway with his firearm drawn. What he saw in the next few seconds—particularly who controlled the gun and where it was pointed—is disputed. Dougherty directed Capuano to move from his line of fire and then fired three shots, killing Hofmann. JS ¶¶ 27–36.

The parties largely agree on how the encounter unfolded, and the body-worn camera footage captures much of it. The footage, however, does not eliminate the central disputes surrounding the encounter's final moments. The first is whether Capuano reasonably followed Hofmann back toward the residence after the officers had just secured distance and disarmament. The second is whether, once the struggle began, Hofmann's gun presented an immediate threat when Dougherty fired.

Rebecca Hofmann, as administrator of Hofmann's estate, asserts Fourth Amendment claims arising from Capuano's pursuit and seizure of Hofmann and Dougherty's use of deadly force; a claim under Title II of the Americans with Disabilities Act; municipal liability and failure-to-train claims against the Borough of Malvern (the "Borough"); supervisory liability claims against Marcelli and Dougherty; and Pennsylvania law claims for assault and battery, wrongful death, and survival. Defendants move for summary judgment on all remaining claims. For the reasons that follow, the Court grants the motion as to the claims against Capuano, Listmeier,

Marcelli, and the Borough, but concludes that genuine disputes of material fact preclude summary judgment on the Fourth Amendment excessive force and assault-and-battery claims against Dougherty. The wrongful death and survival claims remain only to the extent they derive from those surviving claims against Dougherty.

## I. FACTUAL BACKGROUND

### A. The Welfare Check and Initial Encounter

At approximately 11:11 a.m. on May 19, 2022, Chester County emergency services created a priority-one police event for a welfare check at 814 Charleston Greene in Malvern Borough. JS ¶ 1. The 911 CAD ("Computer-Aided Dispatch") event recorded that the subject was a forty-year-old woman who was "poss[ibly] having a mental health crisis," going through a divorce, having suicidal ideations, and had written a goodbye message on Twitter. Ex. B at 1. The dispatch information developed as officers responded. Shortly after the initial call, the CAD identified the subject as "MADDIE HOFMANN," noted that Hofmann might also go by "MATTHEW HOFMANN," and stated that she was transitioning from male to female. Ex. B at 1–2.

The officers arrived to check on Hofmann's welfare, not to investigate a reported crime. Capuano responded from the Malvern police station. Listmeier, who was performing community-policing duties at Saint Patrick School, heard the dispatch, requested the call information, and responded from there. Dougherty was not formally dispatched but chose to respond as well. JS ¶¶ 4–6. At that point, the officers had been told that Hofmann might be experiencing a mental health crisis and had posted a goodbye message, but they had received no report of violence, no information that anyone else was inside the residence, and no warning that Hofmann might be armed. JS ¶¶ 1–3; Plaintiff's Additional Material Facts ("PAF") ¶¶ 1–2.

Upon arrival, Capuano and Listmeier approached the front door while Dougherty initially remained near the patrol vehicles attempting to obtain additional information. JS ¶¶ 10, 13.

Listmeier knocked several times, rang the doorbell, and identified himself as a Malvern police officer. JS ¶¶ 14–17. Hofmann responded from inside the residence, asking who was at the door, and then opened it. Hofmann was holding a handgun and a cellphone and told the officers, "I am in a crisis situation." JS ¶ 18; PAF ¶ 4. Hofmann also told the officers that she had a lawful right to possess the gun and that she was recording the encounter. PAF ¶ 4.

The officers' first response to the firearm was to create distance. Capuano withdrew behind a tree, Listmeier moved toward vehicle cover, and Dougherty took cover behind a nearby dumpster. JS ¶¶ 20–25; PAF ¶ 6. From those positions, the officers continued speaking with Hofmann instead of using force. Although the parties characterize Hofmann's handling of the firearm somewhat differently, Dougherty's contemporaneous account was that, while Hofmann remained outside, the muzzle was generally oriented upward, Hofmann did not direct the firearm toward the officers or nearby residences, and Hofmann did not then present an immediate threat. Dougherty Interview, Ex. J at 40; PAF ¶ 5.

The officers repeatedly directed Hofmann to put the gun down. Listmeier called for Hofmann to do so from behind a pickup truck, and Dougherty likewise instructed her to drop the weapon. JS ¶¶ 24–25. Hofmann initially asked the officers to lower their own weapons and then complied even though they did not. She placed or threw the handgun back inside the residence and announced, "My gun is down." JS ¶ 26; PAF ¶ 7. Capuano thanked Hofmann and directed her to come outside. Within seconds, Hofmann did so. She came forward without a visible firearm, with both hands visible, while continuing to record the encounter on her cellphone. As she moved toward Capuano in the direction he had instructed, each step increased the distance between Hofmann and the gun she had left inside. PAF ¶¶ 7–9.

At that point, the encounter had materially de-escalated. Capuano holstered his firearm and left the cover of the tree. He later explained that he holstered because Hofmann "[did]n't have a weapon at that point," agreed that the threat had diminished, and testified that he did not feel in danger at that moment. Capuano Dep. 139:3–16; PAF ¶ 10. He further acknowledged that Hofmann was then unarmed, the situation was de-escalating, and the level of force represented by his drawn firearm was no longer necessary. *Id.* at 153:22–154:16; PAF ¶ 11. Dougherty described the same moment in similar terms: Hofmann's relinquishment of the firearm had changed the nature of the encounter, and while Hofmann remained outside unarmed, the officers could continue trying to de-escalate the situation. Dougherty Dep. 100:17–101:1, 214:19–216:4, 245:10–246:5; PAF ¶¶ 12–13.

**B. The Pursuit of Hofmann and Use of Deadly Force**

With Hofmann outside and no longer visibly armed, the officers began moving toward her and the residence. PAF ¶ 14. Capuano testified that his plan was to detain Hofmann temporarily and obtain mental health assistance, whether through Valley Creek, an ambulance, or hospital treatment. Capuano Dep. 139:17–24. Dougherty viewed the relinquishment of the gun as "the win" and testified that, while Hofmann remained outside unarmed, physical force was not warranted. In his words, the officers had "reset the clock" and could return to verbal engagement. Dougherty Dep. 100:17–101:1, 214:19–216:4, 245:10–246:5; PAF ¶¶ 12–13.

Capuano left the tree from which he had been speaking with Hofmann, while Dougherty and Listmeier also advanced toward the residence. PAF ¶ 14. Dougherty did not tell Hofmann to remain outside or order her to stop or freeze. According to his deposition testimony, he approached from outside Hofmann's field of view and hoped to remain "as stealthy as" he could. Dougherty Dep. 241:21–243:11; PAF ¶ 15. At that point, Hofmann was still outside, her hands were visible, and the firearm remained inside the residence. PAF ¶¶ 8–9, 14–15.

As Capuano approached, Hofmann said, "do not touch me," pivoted, and moved back toward the residence. Capuano immediately followed and entered the house. JS ¶ 27; PAF ¶ 16; Capuano BWC, Ex. I, 3:12–3:15. Capuano later explained that he believed Hofmann was returning to retrieve the gun and feared that, if she regained it, she could use it against the officers, herself, or others. Capuano Interview, Ex. C at 43. The recording establishes Hofmann's movement toward the house; it cannot, of course, establish why she turned. See JS ¶ 27; PAF ¶¶ 16–17. Plaintiff therefore disputes that Hofmann's intent to retrieve the firearm can be treated as an undisputed historical fact.

Capuano's testimony also provides additional context for his decision to follow. By the time Hofmann turned, Capuano had already left the protection of the tree and identified only a roughly three-foot vinyl fence as remaining cover. Capuano Dep. 161:1–10; PAF ¶ 18. He described his decision to pursue Hofmann as based on "instinct" and, elsewhere, "pure instinct." Capuano Dep. 159:4–161:15, 172:5–16; PAF ¶ 17. His testimony reflects competing considerations: Capuano maintained that he believed immediate pursuit was necessary to prevent Hofmann from obtaining the firearm and potentially shooting him, while also acknowledging testimony on which Plaintiff relies to argue that remaining outside was an available course. *Id.* No additional occupant had been reported inside the residence, and the officers later found none when they searched the home. PAF ¶ 19. Plaintiff thus characterizes the decision to give up distance and pursue Hofmann into the residence as a critical turning point in the encounter. *See* Pl.'s Mem. Opp'n Summ. J. 3–4, ECF No. 78.

The pursuit quickly became a physical struggle. As Capuano closed in from behind, Hofmann bent or reached toward the area where the handgun had been placed and obtained it. Capuano then made physical contact with Hofmann from behind, and the two went to or near the

floor and the bottom of the stairs. JS ¶¶ 27–29; PAF ¶¶ 20–21; Capuano Dep. 215:1–23. During the ensuing struggle, Capuano attempted to control Hofmann's right wrist or forearm and the firearm, applying downward pressure to both. PAF ¶ 22; Capuano Dep. 216:7–217:15; Capuano BWC, Ex. I, 3:18–3:21. There is no dispute that Hofmann had regained possession of the gun by this point. The parties instead disagree about how the weapon was controlled, where it was pointed, and the threat it presented during the final seconds of the struggle.

Dougherty and Listmeier followed toward the entrance. Dougherty moved quickly to the doorway and observed the struggle while keeping his firearm trained on Capuano and Hofmann. Dougherty Dep. 246:9–247:14; PAF ¶ 23. Listmeier positioned himself near the threshold and also observed the struggle. Listmeier Dep. 143:6–144:16; PAF ¶ 24.

The officers gave different accounts of the handgun's movement during the final seconds. Dougherty testified that, as Capuano and Hofmann fought for control, the firearm moved toward Dougherty, toward Capuano, and at times toward what he called "dead space." Dougherty Dep. 217:4–218:21; PAF ¶ 25. He characterized those movements as a product of the struggle for control rather than necessarily an intentional effort by Hofmann to aim the weapon. *Id.*; PAF ¶ 26. After Capuano began to separate from Hofmann, Dougherty did not specifically recall the firearm being pointed directly at him; he remembered the weapon "coming" toward him and "sweeping up." *Id.* at 218:22–219:5; PAF ¶ 27.

Capuano, for his part, had no independent recollection of the gun's precise orientation while he was restraining Hofmann's wrist or forearm. Capuano Dep. 217:20–218:8; PAF ¶ 28. Plaintiff also relies on still frames from Dougherty's body-worn camera that, in Plaintiff's view, depict Capuano continuing to restrain Hofmann's wrist with the firearm oriented downward during portions of the struggle. PAF ¶ 27.

Listmeier remembered the final moments differently. He testified that Hofmann eventually brought the firearm upward toward him and Dougherty and that, at the time Dougherty fired, the gun was pointed toward the officers. Listmeier Dep. 143:6–144:16; PAF ¶ 29.

Plaintiff's expert reached the opposite conclusion from his review of the recordings: DeFoe testified that, despite repeatedly reviewing the body-camera footage, he did not see the barrel move toward Dougherty before the shots were fired. DeFoe Dep. 84:12–86:7; PAF ¶ 30. The body-worn camera recordings capture portions of this sequence from different positions, but no single recording conclusively resolves where the muzzle was directed at the precise moment Dougherty decided to shoot. *See* Pl.'s Mem. Opp'n Summ. J. 4–5, ECF No. 78.

Dougherty testified he believed neither Capuano nor Hofmann was gaining control of the firearm and that allowing the struggle to continue increased the possibility that the gun would discharge, intentionally or accidentally. Dougherty Dep. 248:3–252. He characterized the struggle as a "stalemate." *Id.* As he watched it continue, Dougherty made the decision to shoot, testifying: "I know I'm going to take my shot." *Id.* at 248:3–249:2; PAF ¶ 32. He then directed Capuano to move from his line of fire—"Joe, get out of the way"—and Listmeier repeated the command. JS ¶¶ 32–33; Dougherty Dep. 253:16–21; PAF ¶ 33. Capuano separated sufficiently for Dougherty to obtain a line of fire. Dougherty's testimony thus reflects that he had time to assess the continuing struggle, decide to fire, and direct Capuano to move out of the line of fire before doing so.

Dougherty did not give Hofmann a warning that he was about to shoot. That fact is undisputed. JS ¶ 34; PAF ¶ 34. The commands immediately preceding the gunfire were directed to Capuano, not Hofmann. JS ¶¶ 32–34. Dougherty testified that he did not believe a warning was reasonable or warranted given what he perceived as the heightened threat created by the struggle for control of the firearm. Dougherty Dep. 79:14–81:1. Plaintiff, by contrast, points to their police-

practices expert's testimony that Dougherty's ability to direct Capuano out of the line of fire bears on whether there was also an opportunity to issue a warning or command to Hofmann. DeFoe Dep. 80:9–83:19, 86:11–17; PAF ¶ 31.

Once Capuano moved, Dougherty fired three rounds in rapid succession. The shots struck Hofmann in the face and chest. JS ¶ 34; PAF ¶ 36; Dougherty Dep. 219. Listmeier radioed that shots had been fired and that Hofmann was down. JS ¶ 35. Dougherty first asked whether the other officers were all right and directed them to check the residence; he then radioed for a medic and, after holstering his firearm, directed the officers to retrieve a first-aid kit. JS ¶¶ 35–37.

**C. Malvern's Policies, Training, and Crisis Response Practices.**

The municipal liability and supervisory liability claims place the May 19 encounter within a broader departmental framework for responding to mental health emergencies and the use of force. The Malvern Police Department maintained written policies addressing both subjects. The Department's Mental Health Emergencies policy, in effect since 1995, instructed officers called to a mental health emergency to make "all efforts to stabilize the situation" and provide appropriate mental and medical resources. It further provided that, "[o]n being called" to a situation in which a person was believed to pose an immediate risk of serious injury because of a mental condition, the officer was to gather information concerning the events preceding the call, ascertain any mental or medical condition, contact the person's health-care provider, and contact Crisis Intervention. Police Policy, Ex. M, MALVERN 000606–000607; JS ¶ 43; PAF ¶ 37.

The Malvern Police Department's Use of Force policy, in effect since 2007, governed both deadly and non-deadly force. JS ¶ 42. Among other things, it provided that, "[b]efore using a firearm, police officers shall identify themselves and state their intent to shoot, where feasible." Police Policy, Ex. M, MALVERN 000611; PAF ¶ 35. Malvern Police Chief Louis Marcelli

testified that officers were trained to give a verbal warning before using deadly force when circumstances permitted. As noted above, it is undisputed that Dougherty gave no warning to Hofmann before firing; the commands immediately preceding the shots were directed instead to Capuano to clear the line of fire. JS ¶¶ 32–34; PAF ¶¶ 33–35.

Outside crisis resources were also available. Chief Marcelli testified that Valley Creek Crisis Intervention was available on May 19, 2022 for officers seeking information, advice, or assistance. PAF ¶ 38. Candy Craig, a Valley Creek representative, testified that the organization then offered telephone crisis services, walk-in services, a warm line, and more limited mobile services. Craig Dep. 17:13–18:13. An in-person mobile-crisis response required the scene to be secure but did not foreclose officers from contacting Valley Creek for advice. Once a scene was secured, available options included telephone crisis services, assistance with the Section 302 process, and arranging a crisis assessment; officers themselves also had authority to initiate a Section 302 petition and transport an individual to Paoli Hospital's crisis unit. JS ¶¶ 46–50, 58–59; PAF ¶ 38.

The record concerning how those policies were translated into officer training is less consistent. Capuano testified that he had not received crisis-intervention training before the Hofmann encounter. His prior de-escalation training consisted of an online PoliceOne course he had taken while employed by Easttown Township. Capuano Dep. 50:3–22, 97:14–98:1; PAF ¶ 39. Capuano had nevertheless encountered people experiencing mental health crises during his police work and had contacted Valley Creek in other matters. Capuano Dep. 258:1–260.

Listmeier's experience was more limited. May 19, 2022 fell approximately two and a half months into his first job as a police officer, and he was still completing field training with the Malvern Police Department. PAF ¶ 40. Although Listmeier had received some instruction

concerning mental health at the police academy and the Department had trained him on its use-of-force continuum, he had received no crisis intervention training from the Malvern Police Department before the shooting. Listmeier Dep. 53:10–24, 55:17–19; PAF ¶ 40. He also could not recall a Department policy specifically addressing mental health or crisis-intervention encounters. Listmeier Dep. 55:18–56:11; PAF ¶ 41.

Dougherty, the ranking officer at the scene, agreed in his deposition that crisis intervention, de-escalation training, and an understanding of mental illness are among the fundamental areas of police training. Dougherty Dep. 48:6–18. He also agreed that communication can reduce conflict and the need for force, while cautioning that a person in crisis may remain unpredictable even after an encounter has temporarily calmed. *Id.* at 68:6–69:25. That understanding was consistent with his description of the earlier portion of the Hofmann encounter: once Hofmann put down the firearm, Dougherty believed the officers had de-escalated the immediate danger and could again "slow these things down." *See id.* at 73:3–6, 76:15–77:4.

Chief Marcelli testified that full-time Malvern officers were expected to receive crisis-intervention and de-escalation training. Nearly all full-time officers, he said, had attended or were expected to attend such training. The requirement, however, was not contained in a written departmental directive; Marcelli described it as something he kept "up here in my head." Marcelli Dep. 30:1–11; PAF ¶ 42. He separately testified that Malvern maintained both physical and electronic policy systems and had no formal procedure for ensuring that the two contained the same policies. PAF ¶ 47. Borough Council, rather than Marcelli individually, approved departmental policies. JS ¶ 44; PAF ¶ 48.

It is undisputed that Malvern officers had responded to the Hofmann residence approximately ten months earlier and generated an incident report describing a possible mental or

emotional disorder and a reported breakdown. PAF ¶ 3; 2021 Incident Report, Ex. T. It is also undisputed, however, that the three officers who responded on May 19 were unaware of that report before the encounter. Defendants maintain that the officers ordinarily depended on dispatch to relay relevant prior history and that retrieving older incident reports from a patrol vehicle's computer was possible but cumbersome. *See* Defs.' Resp. to PAF ¶ 3.

Scott DeFoe, Plaintiff's police practices expert, regarded the officers' initial decision to retreat to cover as appropriate and Capuano's efforts to obtain Hofmann's relinquishment of the firearm as successful. In his view, the significant tactical departure occurred after that success, when Capuano left cover and advanced toward Hofmann without a coordinated plan among the three officers. DeFoe Dep. 34:15–37:3, 45:20–48:15; PAF ¶ 49. He further opined that, once Hofmann turned back toward the firearm, Capuano should have created distance rather than entering the residence alone and engaging in a close-range struggle for the gun. *Id.* at 67–71. DeFoe characterized the entry as contrary to accepted training because it eliminated the distance and cover the officers had previously established. DeFoe also criticized the police response more broadly. His report identifies deficiencies in training and implementation concerning interactions with people experiencing mental health crises, crisis intervention, de-escalation, verbal communication, coordination among officers, use of cover, supervisory command, and deadly force. DeFoe Report, Ex. X. As to the shooting itself, he opined that Dougherty had an opportunity to warn Hofmann before firing because Dougherty had time to direct Capuano out of his line of fire. DeFoe acknowledged that the significance of any warning depended on the position of the firearm and whether Hofmann had an opportunity to comply. DeFoe Dep. 80:9–83:19, 86:11–17; PAF ¶ 31.

Chief Marcelli did not personally participate in the welfare check or the use of force against Hofmann. He arrived only after hearing the radio transmission that shots had been fired and did

not directly supervise the scene or the officers' actions before the shooting. JS ¶¶ 60–61. Thus, the claims involving Marcelli concern his alleged role in the policies, training, supervision, and departmental practices that preceded the encounter rather than any on-scene direction he gave while it unfolded.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party, and a fact is "material" if it might affect the outcome under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of identifying the portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is satisfied, the nonmoving party must identify specific evidence from which a reasonable jury could find in its favor; it may not rest on allegations, speculation, or unsupported assertions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In evaluating the record, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). The Court may not weigh evidence or make credibility determinations, as those functions belong to the jury. *Anderson*, 477 U.S. at 255. But the nonmovant receives only those inferences that are reasonable and supported by record evidence. *See Matsushita*, 475 U.S. at 587.

These principles take on particular importance where, as here, a fatal use of force leaves the decedent unable to provide an account of the encounter. The Third Circuit has instructed courts in such cases to examine the record carefully rather than simply accept an officer's characterization of the threat that allegedly justified deadly force. *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999). At the same time, the summary judgment standard does not authorize the Court to substitute hindsight for the perspective of an officer confronting a rapidly developing situation. The constitutional question remains an objective one, evaluated from the facts and circumstances confronting the officer when the challenged conduct occurred. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

## III. DISCUSSION

### A. The Initial Knock at Hofmann's Residence Was Not a Fourth Amendment Seizure.[1]

The officers' initial approach to Hofmann's residence and knock at the door did not constitute a seizure under the Fourth Amendment. Police officers, like other members of the public, generally may approach a residence by the route ordinarily used by visitors and knock on the door in an effort to speak with an occupant. *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003). That contact becomes a seizure only when, considering the circumstances objectively, the police communicate through their words or conduct that the person is not free to decline the interaction or otherwise terminate it. *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (citing *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980), and *Florida v. Bostick*, 501 U.S. 429,

[1] Plaintiff does not respond to Defendants' argument that the officers' initial approach and knock at the residence did not constitute a Fourth Amendment seizure. Instead, Plaintiff frames the disputed Fourth Amendment conduct as Capuano's later pursuit, entry, and seizure of Hofmann and Dougherty's subsequent use of deadly force. *See* Pl.'s Mem. Opp'n Summ. J. 6–12, ECF No. 78. The Court therefore treats any separate claim arising from the initial knock and announce as effectively abandoned. In any event, because Defendants seek summary judgment on that theory and the issue is readily resolved on the record, the Court addresses it briefly.

436 (1991)). Relevant considerations include the threatening presence of multiple officers, the display of weapons, physical contact, and language or tone suggesting that compliance is compulsory. *Id.*

*Haberle* is particularly instructive here because it arose from a police response to a suicidal person known to possess a firearm. There, an individual named Nixon told his partner that he intended to kill himself, broke into another person's home and took a handgun, and then went to his cousin's apartment. *Id.* at 174. Police located Nixon there, and some officers proposed establishing a perimeter and requesting trained crisis negotiators. Officer Troxell rejected those suggestions, approached the apartment, knocked, and identified himself as a police officer; Nixon then retreated to a bedroom and shot himself. *Id.* The Third Circuit nevertheless held that the knock itself was not a seizure. Whatever might be said about Troxell's tactics, he had "merely knocked on the door and announced his presence." *Id.* at 176. There were no threatening remarks or commands, and nothing known to Nixon about the officers outside that would have conveyed that he was not free to decline the encounter. *Id.* The court thus separated the wisdom of an officer's response to a mental health emergency from the antecedent Fourth Amendment question whether the officer had restrained the person's liberty at all.

Here, Capuano and Listmeier approached Hofmann's front door as part of the welfare check while Dougherty initially remained near the patrol vehicles gathering information. JS ¶¶ 10, 13. Listmeier knocked several times and rang the doorbell. JS ¶ 14. When Hofmann called from inside, "Who is bothering me? Who is at my door?," Listmeier responded, "Hello, it's Officer Listmeier, Malvern . . . It's Officer Listmeier, Malvern Police." JS ¶¶ 16–17. Nothing in the record shows that, before Hofmann opened the door, either officer entered the residence, touched

Hofmann, displayed a firearm, ordered Hofmann to open the door, threatened to enter, or otherwise communicated that Hofmann was required to answer.

*Haberle* involved several circumstances that might otherwise bear on whether a police encounter became a seizure: officers knew Nixon was suicidal and armed, multiple officers were present outside the residence, and one officer possessed an arrest warrant. 885 F.3d at 174, 176. The Third Circuit nevertheless held that the encounter had not become a seizure where the officer did no more than approach, knock, and identify himself. *Id.* at 176. Here, the officers similarly went to the front door for the legitimate purpose of checking Hofmann's welfare and sought contact in the manner ordinarily available to any visitor. *See Estate of Smith*, 318 F.3d at 519. That the officers knew Hofmann might be experiencing a mental health crisis does not, under *Haberle*, transform the knock itself into a seizure. Nor can the events that followed—Hofmann's appearance with a firearm and the officers' responsive display of force—retroactively convert the preceding knock into one.

Accordingly, no reasonable jury could find that Hofmann was seized when Capuano and Listmeier approached the residence, knocked at the door, and identified themselves. Defendants are entitled to summary judgment on any Fourth Amendment claim predicated on that initial encounter.

### B. Capuano Is Entitled to Qualified Immunity on the Fourth Amendment Claim Arising from His Pursuit and Seizure of Hofmann.

Capuano is entitled to qualified immunity. Viewed in Plaintiff's favor, the record permits substantial questions about the decision to pursue Hofmann into the residence immediately after the officers had obtained disarmament, distance, and compliance. The Court need not decide, however, whether Capuano's warrantless entry and ensuing seizure ultimately violated the Fourth Amendment. Even assuming a constitutional violation, the law on May 19, 2022 did not clearly

establish that an officer in Capuano's position was required to remain outside rather than follow a person who, seconds after displaying and relinquishing a firearm during a mental health crisis, abruptly turned back toward the known location of that unsecured firearm. Supreme Court precedent addressing similarly fluid encounters does not place the unlawfulness of Capuano's response beyond debate.

Qualified immunity protects a government official from damages unless the plaintiff establishes that the official violated a constitutional right that was "clearly established" at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). The first inquiry asks whether the officer's conduct violated a constitutional right; the second asks whether that right was clearly established at the time of the conduct. A court may address the inquiries in either order. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). At summary judgment, the ordinary Rule 56 principles still apply: the Court must credit the nonmovant's evidence and draw reasonable inferences in her favor rather than resolve genuine factual disputes in the officer's favor. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). Where historical facts material to qualified immunity remain disputed, those facts belong to the jury; the ultimate availability of qualified immunity remains a question of law for the Court. *Carswell v. Borough of Homestead*, 381 F.3d 235, 242–43 (3d Cir. 2004); *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007).

The clearly established inquiry is deliberately demanding. A right is clearly established only when, at the time of the conduct, existing law made its unlawfulness apparent to every reasonable officer confronted with the circumstances at hand. *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts may not define the right at a high level of generality, such as a right to be free from unreasonable searches or excessive force. *City of Tahlequah v. Bond*, 595 U.S. 9, 12–13 (2021) (per curiam); *White v. Pauly*, 580 U.S.

73, 79 (2017) (per curiam). Especially in the Fourth Amendment context, the inquiry ordinarily requires precedent addressing circumstances sufficiently similar to make clear how the general constitutional rule applies. *City of Tahlequah*, 595 U.S. at 12–13. In this Circuit, that notice typically comes from controlling Supreme Court or Third Circuit precedent or a robust consensus of persuasive authority from the courts of appeals. *James v. N.J. State Police*, 957 F.3d 165, 169–70 (3d Cir. 2020).

The first qualified immunity prong asks whether, viewing the record in Plaintiff's favor, Capuano's pursuit into the residence and ensuing physical seizure of Hofmann violated the Fourth Amendment. That inquiry implicates two related principles: the heightened protection the Fourth Amendment affords the home and the requirement that a seizure, once effected, be objectively reasonable. The Court begins with Capuano's entry into the residence.

The Fourth Amendment's protection is at its strongest at the threshold of the home, and warrantless entry is presumptively unreasonable unless a recognized exception to the warrant requirement applies. *See Caniglia v. Strom*, 593 U.S. 194, 198–99 (2021). *Caniglia* arose, like this case, from a police response to a possible mental health emergency involving a firearm. *Id.* at 196. During an argument with his wife, Caniglia placed a handgun on a table and asked her to shoot him. *Id.* When his wife could not reach him the following morning, she requested a welfare check. *Id.* Officers encountered Caniglia outside his home, concluded that he might pose a danger to himself or others, and arranged for him to undergo a psychiatric evaluation. *Id.* at 196–97. After Caniglia left by ambulance, however, the officers entered the home without a warrant and seized two handguns. *Id.* The First Circuit upheld that conduct under a freestanding "community caretaking" exception derived from cases involving automobiles. *Id.* at 197. The Supreme Court rejected that rule, emphasizing the constitutional distinction between vehicles and homes and

holding that the performance of non-criminal caretaking functions does not, by itself, authorize warrantless entry into a residence. *Id.* at 198–99.

*Caniglia* did not eliminate the established exceptions that permit officers to enter a home in a genuine emergency. To the contrary, the Court expressly recognized that warrantless entry remains permissible when traditional exigent circumstances exist, including when officers reasonably believe immediate action is necessary to render emergency assistance to an injured occupant or protect someone from imminent injury. *Id.* at 198; *Brigham City v. Stuart*, 547 U.S. 398, 403–06 (2006); *Michigan v. Fisher*, 558 U.S. 45, 47–49 (2009) (per curiam). The distinction is consequential here: the fact that Capuano was performing a welfare check did not itself authorize entry into Hofmann's home, but the protective nature of the call did not foreclose entry if the circumstances supplied an objectively reasonable basis to believe that immediate intervention was necessary to prevent serious harm. *See Brigham City*, 547 U.S. at 404–06; *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). Thus, whether Capuano's warrantless entry was constitutionally permissible turns on whether the circumstances confronting him supplied an objectively reasonable basis to believe that immediate entry was necessary to prevent serious harm.

Capuano's physical apprehension of Hofmann presents a related Fourth Amendment question. Once Capuano made physical contact and restrained Hofmann, a seizure occurred, and its reasonableness is judged under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 395–97 (1989). Relevant considerations include the reason for the police encounter, whether the person posed an immediate threat to officers or others, whether she was resisting or attempting to evade seizure, the possibility that she was armed, and the number of officers present. *Id.* at 396; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). The inquiry is objective and must account

for the circumstances confronting the officer at the time, not with the benefit of hindsight. *Graham*, 490 U.S. at 396–97.

Viewed in Plaintiff's favor, the circumstances immediately preceding Capuano's pursuit permit competing conclusions about whether immediate entry was necessary. Hofmann had appeared at the door with a firearm, but the officers had retreated to cover and persuaded her to put it down. Hofmann announced, "My gun is down," placed the firearm inside the residence, and came outside at Capuano's direction with no firearm visible. JS ¶¶ 18–27; PAF ¶¶ 4–9. Capuano then holstered his own weapon. He testified that Hofmann "doesn't have a weapon at that point," that the threat had diminished, and that he did not then feel endangered. Capuano Dep. 139:3–24; PAF ¶ 10. His plan was to detain Hofmann temporarily and obtain mental health assistance. *Id.* Dougherty likewise regarded relinquishment of the gun as "the win" and testified that, while Hofmann remained outside unarmed, physical force was not warranted and the officers could return to verbal engagement. PAF ¶¶ 12–13.

The situation changed when the officers began moving toward Hofmann. As Capuano approached, Hofmann said "do not touch me," pivoted, and moved back toward the residence. PAF ¶¶ 14–17. At that moment, Hofmann had no visible firearm, and no injured person, hostage, or other occupant had been reported inside. PAF ¶ 19. Capuano nevertheless followed immediately. He testified that he believed Hofmann was returning to retrieve the gun and that failing to follow could have exposed him and others to being shot. JS ¶ 27; Defs.' Resp. to PAF ¶ 17. He also described the decision to enter as a reaction based on "instinct" and "pure instinct," rather than a considered application of policy or procedure. Capuano Dep. 172:5–17.

Those facts make the constitutional question a close one. A jury crediting Plaintiff's account could conclude that the immediate emergency had subsided when Hofmann relinquished

the firearm and came outside, and that the officers had available to them the same tools—distance, cover, and communication—that had just succeeded in reducing the danger. Under that view, Hofmann's movement toward the residence did not necessarily require Capuano to abandon those advantages and immediately cross the threshold, particularly when no third party inside was known to be endangered. The Fourth Amendment does not make a particular tactical choice reasonable merely because an officer could identify some risk that it sought to prevent.

At the same time, however, the risk confronting Capuano was not hypothetical in the ordinary sense. The firearm remained unsecured only a short distance away, and Capuano had personally watched Hofmann place it there moments earlier. Hofmann had displayed the gun while experiencing an apparent mental health crisis and then abruptly moved back toward its known location. Capuano testified that he believed she intended to retrieve it. The ensuing seconds confirmed that the weapon remained accessible: as Capuano closed the distance, Hofmann reached toward the area where the firearm had been placed, obtained it, and became engaged with Capuano in a physical struggle involving the gun. JS ¶¶ 27–29; PAF ¶¶ 17, 20–22. That later development cannot retroactively create an exigency that did not exist when Capuano crossed the threshold, but it underscores the concrete danger he perceived when Hofmann turned toward the residence.

The Court need not choose between those competing views. Qualified immunity permits courts to resolve a claim on the clearly established prong without first deciding whether the challenged conduct violated the Constitution. *Pearson*, 555 U.S. at 236. The Court assumes for purposes of the motion that Plaintiff could establish that Capuano's immediate pursuit, entry, and seizure were unreasonable and proceeds to whether that unlawfulness was clearly established on May 19, 2022. It was not.

A right is clearly established only when existing precedent has made the unlawfulness of the officer's particular conduct sufficiently clear that every reasonable officer would have understood the conduct to be unconstitutional. *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has repeatedly cautioned against defining the right at a high level of generality, particularly under the Fourth Amendment, where the reasonableness of police conduct often turns on small but consequential factual differences. *City of Tahlequah*, 595 U.S. at 12; *White*, 580 U.S. at 79. Existing law need not involve identical facts, but it must place the constitutional question "beyond debate" in the circumstances the officer actually confronted. *Wesby*, 583 U.S. at 63–64.

The relevant question is more specific: whether, as of May 2022, clearly established law prohibited an officer from immediately following a person into her residence and attempting to seize her when the officer knew that she had just displayed a firearm during an apparent suicidal crisis, had relinquished that firearm only moments earlier, and then abruptly moved back toward the residence where the firearm remained. The right cannot be framed simply as the right to be free from warrantless entry into a home or from an unreasonable seizure. Those propositions were unquestionably established. *See Caniglia*, 593 U.S. at 198–99; *Graham*, 490 U.S. at 395–97. The question is whether existing precedent placed the unlawfulness of Capuano's conduct beyond debate in the particular circumstances he confronted.

*Ryburn v. Huff*, though not factually identical, provides a useful comparison. 565 U.S. 469. There, officers were dispatched to a high school student's home after his principal reported that he had threatened to "shoot up" the school. *Id.* at 470. The officers did not know whether a firearm was present in the home. *See id.* at 471. After an officer asked the student's mother whether there were guns inside, she ran into the residence without answering, and the officers followed. *Id.* at

471–72. The Supreme Court concluded that reasonable officers could view those circumstances as presenting an imminent threat sufficient to justify entry. *Id.* at 474–77. Here, the officers had been dispatched principally out of concern for Hofmann's own welfare, and Hofmann had already relinquished the firearm and complied with Capuano's direction to come outside before turning back toward the residence. Those facts distinguish this case from *Ryburn* and may bear on the ultimate merits. Yet Capuano also had more concrete information about the danger inside the home: he had just seen Hofmann possess a firearm and relinquish it inside the residence moments before she turned back toward it. Given *Ryburn*'s recognition that a perceived threat of violence can justify immediate warrantless entry, that decision would not have given every reasonable officer fair warning that Capuano's entry here was unconstitutional.

*City & County of San Francisco v. Sheehan* reinforces that conclusion in the particular context of a mental health crisis. 575 U.S. 600 (2015). There, officers entered the room of a woman experiencing a psychiatric emergency to take her for an evaluation. *Id.* at 603–04. She confronted them with a knife and threatened to kill them, causing the officers to retreat and close the door. *Id.* Rather than wait for additional assistance, the officers reentered; Sheehan again advanced with the knife and was ultimately shot. *Id.* at 604–07. Although the court of appeals concluded that a jury could find the second entry unreasonable, the Supreme Court held that the officers were entitled to qualified immunity because no clearly established precedent informed them that reentry under those circumstances was unconstitutional. *Id.* at 612–17.

Plaintiff's theory here bears some resemblance to the argument advanced in *Sheehan*: that officers confronting a person in psychiatric crisis should have relied on time, distance, containment, and continued communication rather than taking action that precipitated a closer confrontation. DeFoe's testimony supports that tactical criticism. *Sheehan*, however, makes clear

that evidence of safer or preferable police tactics does not itself establish that the Constitution clearly required those alternatives. *See id.* at 616–17. The relevant inquiry remains whether precedent existing at the time gave Capuano fair notice that the course he selected was unlawful.

*City of Tahlequah v. Bond* reinforces that principle. 595 U.S. 9, 12–14 (2021). There, the Supreme Court again emphasized that generalized Fourth Amendment principles do not defeat qualified immunity where no precedent has found a constitutional violation under sufficiently similar circumstances. *Id.*

Plaintiff's remaining authorities do not supply the requisite notice. *Couden v. Duffy* involved materially different circumstances and does not address an officer's immediate pursuit of a recently armed person toward an unsecured firearm inside a residence. 446 F.3d 483 (3d Cir. 2006). Nor do the broader rules announced in *Brigham City*, *Caniglia*, and *Graham* resolve that narrower question. Those decisions establish that a welfare-related purpose alone does not authorize warrantless home entry, that an objectively reasonable emergency may justify one, and that a seizure must be objectively reasonable. They do not clearly establish that an officer in Capuano's position was constitutionally required to remain outside rather than follow Hofmann toward the firearm she had relinquished moments earlier.

The later cases on which Plaintiff relies cannot alter that conclusion. *Ardo v. Pagan* postdates the May 2022 encounter and, in any event, is a district court decision. 652 F. Supp. 3d 545 (E.D. Pa. 2023). *Barnes v. Felix* permits consideration of the events leading up to a use of force as part of the Fourth Amendment totality inquiry, but it likewise postdates the conduct at issue and cannot establish what the law clearly required in 2022. 605 U.S. 73 (2025). The same is true of *Case v. Montana*, 607 U.S. 107 (2026).

The Court, therefore, need not decide whether Capuano's pursuit, entry, and seizure ultimately violated the Fourth Amendment. Even assuming Plaintiff could establish a constitutional violation, existing precedent did not place beyond debate that an officer was required to remain outside when a recently armed person experiencing an apparent suicidal crisis abruptly moved back toward a residence where the officer knew a firearm remained. The law may have permitted Capuano to choose a different course, and the record permits criticism of the one he chose. Qualified immunity, however, turns on whether then-existing law gave him fair warning that his conduct was unconstitutional. It did not.

Capuano is therefore entitled to qualified immunity on Plaintiff's Fourth Amendment claim arising from his pursuit and seizure of Hofmann, and summary judgment will be entered in his favor on that claim.

**C. A Jury Must Decide Whether Dougherty's Use of Deadly Force Was Reasonable.**

The constitutional question as to Dougherty is different from the one presented by Capuano. There is no dispute that Dougherty seized Hofmann when he shot her. The question is whether, at the moment he fired, the circumstances gave a reasonable officer probable cause to believe Hofmann posed an immediate threat of death or serious physical injury to Capuano, Dougherty, or another person. On this record, that question turns on genuinely disputed facts that the Court cannot resolve at summary judgment.

The Fourth Amendment permits deadly force when an officer has probable cause to believe a person "poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 11–12 (1985). The inquiry considers the totality of the circumstances from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Where deadly force is concerned, the existence and immediacy of the perceived threat are central. *Abraham v. Raso*, 183 F.3d 279, 289–94 (3d Cir. 1999).

The Third Circuit has repeatedly emphasized that the justification for deadly force must exist when the force is used. In *Lamont v. New Jersey*, officers reasonably began firing when a suspect abruptly withdrew a concealed hand in a manner that appeared to be an attempt to draw a gun. 637 F.3d 177, 180, 183–84 (3d Cir. 2011). Once his empty hand became visible, however, the justification for continued deadly force could have changed, requiring a jury to determine whether the later shots remained reasonable. *Id.* at 184–85. *Jefferson v. Lias* applied the same principle where the evidence permitted a jury to find that a vehicle no longer posed the threat described by the officer when he fired. 21 F.4th 74, 81–84 (3d Cir. 2021). The relevant question is not whether Hofmann had created a dangerous situation, but whether she presented an immediate lethal threat when Dougherty fired.

There is no genuine dispute that the situation Dougherty encountered was dangerous. Hofmann had regained possession of the firearm, and she and Capuano were physically struggling over it near the foot of the stairs. PAF ¶¶ 20–22. A reasonable officer need not wait for a firearm to discharge before responding to an imminent threat. The dispute concerns what Dougherty could reasonably perceive about the control and direction of the firearm when he decided to shoot.

A jury could credit Dougherty's account and find the shooting reasonable. Dougherty testified that neither Hofmann nor Capuano was gaining control of the firearm, describing the struggle as a "stalemate" that carried an increasing risk of an intentional or accidental discharge. Dougherty Dep. 249–52. He further testified that the firearm moved toward him during the struggle and, as Capuano began to separate, was "coming" toward him and "sweeping up." Dougherty Dep. 217:4–219:5; PAF ¶¶ 25–27. Listmeier similarly recalled Hofmann bringing the firearm upward toward the officers. Listmeier Dep. 144:1–16; PAF ¶ 29. If the jury credits that evidence, it could

readily conclude that Dougherty reasonably perceived an immediate threat of death or serious bodily injury.

The record does not compel that account. Dougherty acknowledged that the firearm moved in several directions during the struggle—toward him, toward Capuano, and toward what he called "dead space"—and attributed those movements to the contest for control rather than necessarily to an intentional effort by Hofmann to aim the weapon. Dougherty Dep. 217:4–218:21; PAF ¶¶ 25–26. After Capuano began to separate, Dougherty did not specifically recall the gun having reached a position in which it pointed directly at him; he recalled it "coming" toward him and "sweeping up." Dougherty Dep. 218:22–219:5; PAF ¶ 27. Capuano, who had been restraining Hofmann's right wrist or forearm, had no independent recollection of the firearm's precise orientation. Capuano Dep. 217:20–218:8; PAF ¶ 28. Plaintiff's police-practices expert, after repeatedly reviewing the body-worn-camera footage, testified that he did not see the barrel move toward Dougherty before the shots. DeFoe Dep. 84:12–86:7; PAF ¶ 30.

The recordings do not resolve the dispute. Dougherty approached the doorway rapidly and viewed the struggle from a moving position. Dougherty Dep. 246:9–247:14; PAF ¶ 23. The body-worn cameras capture portions of the encounter from different angles, but none provides an unobstructed view of the firearm throughout the critical interval. Plaintiff reads sequential still frames as showing Capuano continuing to restrain Hofmann's wrist while the firearm remained directed downward; Defendants emphasize Hofmann's possession of the gun and its upward movement as Capuano separated. Unless video evidence "blatantly contradict[s]" one version of events, the Court may not resolve such competing interpretations at summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The footage here does not conclusively establish the firearm's position or who controlled it when Dougherty fired.

The absence of a warning provides additional context but does not independently resolve the constitutional question. Dougherty testified that he reached a point during the struggle when "I know I'm going to take my shot," directed Capuano to move from his line of fire, and then fired three rounds without first directing a warning or command to Hofmann. Dougherty Dep. 248:17–249:25, 253:16–21; JS ¶ 34; PAF ¶¶ 32–34. *Garner* contemplates a warning "where feasible," 471 U.S. at 11–12, and Malvern's own policy likewise required officers, where feasible, to identify themselves and state their intent to shoot. PAF ¶ 35. Whether a warning was feasible bears on the same disputed issue of immediacy; it does not establish unreasonableness by itself.

Ultimately, the mere presence of a firearm does not answer the constitutional question. What matters is whether, when Dougherty fired, a reasonable officer in his position would have believed Hofmann posed an immediate threat of death or serious injury. Answering that question requires findings concerning the firearm's direction, the degree of control Capuano retained over Hofmann's armed arm, and what Dougherty could reasonably perceive as Capuano separated. Those are factual determinations for a jury. Accordingly, summary judgment will be denied on Plaintiff's Fourth Amendment excessive force claim against Dougherty.

**D. Dougherty Is Not Entitled to Qualified Immunity.**

The same factual disputes that preclude summary judgment on the excessive force claim also preclude qualified immunity for Dougherty at this stage. By May 2022, it was clearly established that an officer may use deadly force when he reasonably perceives an immediate threat of death or serious bodily injury, *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985), and that the justification for deadly force must exist when the force is used, *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999); *Lamont v. New Jersey*, 637 F.3d 177, 184–85 (3d Cir. 2011). *Jefferson v. Lias* likewise made clear before this encounter that an officer may not use deadly force once the

circumstances no longer support a reasonable belief that the officer or others face an immediate threat. 21 F.4th 74, 81–89 (3d Cir. 2021).

Defendants' reliance on cases such as *Kisela v. Hughes*, 584 U.S. 100 (2018), and *James v. New Jersey State Police*, 957 F.3d 165 (3d Cir. 2020), does not alter that conclusion. There, the circumstances establishing an immediate threat were not materially disputed: the armed individuals remained capable of inflicting serious harm and failed to comply with commands before the officers fired. *Kisela*, 584 U.S. at 102–07; *James*, 957 F.3d at 168–73. Here, by contrast, the record permits competing findings about the position of Hofmann's firearm, the degree of control Capuano retained over her armed arm, and the threat Dougherty reasonably perceived when he fired.

Qualified immunity, therefore, turns on disputed historical facts, not uncertainty in the governing law. If a jury credits Dougherty's account that an uncontrolled firearm was rising toward the officers, the shooting may well have been constitutionally permissible. If the jury instead finds that Capuano retained control of Hofmann's armed arm and that Hofmann did not present an immediate lethal threat when Dougherty fired, existing precedent gave Dougherty fair warning that deadly force was impermissible. The Court cannot resolve those competing factual accounts in Dougherty's favor on summary judgment. *See Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007).

### E. Listmeier Is Entitled to Summary Judgment Because the Record Does Not Establish His Personal Involvement in a Constitutional Violation.

The Fourth Amendment claims against Listmeier fail for a different reason. Section 1983 imposes liability only for a defendant's own conduct. A plaintiff must show that the particular officer had "personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Thus, where several officers participate in an encounter, liability cannot be imposed collectively merely because an officer was present when another officer committed the

alleged constitutional violation. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289–91 (3d Cir. 2018).

The record does not connect Listmeier to either constitutional violation that remains at issue. Listmeier did not pursue Hofmann into the residence, tackle or restrain Hofmann, or fire the shots that killed her. As the encounter moved inside, he remained at or near the threshold, behind or beside Dougherty. Although Listmeier could see the struggle and repeated the direction for Capuano to "get out of the way," JS ¶ 33; Listmeier Dep. 143:6–144:16, nothing in the record permits a reasonable inference that Listmeier directed Dougherty to shoot, caused Dougherty to do so, or otherwise participated in the decision to use deadly force.

Plaintiff emphasizes that Listmeier had earlier left cover and moved toward the residence with the other officers. That participation does not suffice. Even assuming Capuano's later pursuit and seizure violated the Fourth Amendment, the record does not show that Listmeier joined that pursuit, assisted in the physical seizure, or directed Capuano to enter the home. Mere proximity to the events culminating in a constitutional violation is not personal involvement under § 1983. *See Jutrowski*, 904 F.3d at 290–91. Furthermore, liability cannot rest on a failure to intervene. An officer may be liable for failing to prevent another officer's use of excessive force only when the officer had a "realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002). The final struggle and shooting unfolded within seconds, and the record provides no basis from which a jury could find that Listmeier had such an opportunity before Dougherty fired.

Accordingly, Plaintiff has not produced evidence from which a reasonable jury could find Listmeier personally responsible for a Fourth Amendment violation. Summary judgment will be entered in his favor on the § 1983 claims.

**F. Defendants Are Entitled to Summary Judgment on Plaintiff's ADA Claims.**

Title II of the Americans with Disabilities Act ("ADA") prohibits a public entity from excluding a qualified individual with a disability from its services, programs, or activities, or otherwise discriminating against that person "by reason of" disability. 42 U.S.C. § 12132. The Third Circuit has held that Title II applies in the policing context and that a public entity may be liable when officers fail to reasonably accommodate a known disability and the disability is a but-for cause of the resulting harm. *Haberle v. Troxell*, 885 F.3d 170, 178–81 (3d Cir. 2018). A plaintiff seeking compensatory damages must also establish intentional discrimination, which may be shown through deliberate indifference. *Id.* at 181; *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261–65 (3d Cir. 2013).

Plaintiff does not oppose dismissal of the Title II claim against the individual Defendants. *See* Pl.'s Mem. Opp'n Summ. J. 12, ECF No. 78. The Court, therefore, considers only the claim against the Borough. Defendants do not separately challenge whether Hofmann had a qualifying disability; their arguments instead concern whether a reasonable accommodation was required, whether the challenged conduct occurred "by reason of" Hofmann's disability, and whether the Borough acted with the deliberate indifference necessary to support compensatory damages.

Plaintiff's failure-to-accommodate theory is narrow. Plaintiff does not contend that officers were required to approach Hofmann while she remained armed or to send a civilian crisis responder into an unsecured scene. Rather, Plaintiff contends that once Hofmann relinquished the firearm, came outside without a visible weapon, and demonstrated that communication had been effective, the officers should have maintained distance, continued verbal engagement, and allowed additional time before moving toward her. The Malvern Police Department's own Mental Health Emergencies policy directed officers to stabilize mental health emergencies, gather relevant information, contact Crisis Intervention, and provide appropriate mental and medical resources.

PAF ¶¶ 36–37. Viewed in Plaintiff's favor, a jury could find that continued distance and communication were reasonable accommodations once the immediate threat had diminished.

The claim nonetheless fails on the damages requirement. Deliberate indifference requires evidence that the relevant municipal decisionmaker knew that a violation of federally protected rights was substantially likely and failed to act despite that knowledge. *Haberle*, 885 F.3d at 181. Plaintiff points to shortcomings in the Malvern Police Department's crisis response preparation: Capuano had not received crisis intervention training before May 2022, Listmeier had received no crisis-intervention or mental health training from the Department, and Marcelli testified that the crisis intervention training requirement was unwritten. PAF ¶¶ 38–42. Those facts support criticism of the Department's training and implementation, but they do not establish that Borough policymakers knew the Department's practices were substantially likely to deny reasonable accommodations to persons with mental disabilities.

*Haberle v. Borough of Nazareth* illustrates the distinction. 936 F.3d 138 (3d Cir. 2019). There, allegations of repeated prior incidents, together with municipal awareness of a specific need for corrective measures, were sufficient to support deliberate indifference. *Id.* at 145–52. The record here contains no comparable pattern of prior failures to accommodate persons experiencing mental health crises and no evidence that Borough policymakers had previously been alerted that the Department's crisis-response practices were causing ADA violations. The prior 2021 contact with Hofmann does not fill that gap because the record does not show that the earlier encounter involved a similar failure of accommodation or otherwise placed the Borough on notice of a substantially likely Title II violation.

Thus, even if a jury could find that the officers failed to reasonably accommodate Hofmann during the encounter, the record would not permit a finding that the Borough acted with deliberate

indifference. Because that showing is necessary to recover compensatory damages, Defendants are entitled to summary judgment on Plaintiff's Title II claim.

### G. The Borough Is Entitled to Summary Judgment on Plaintiff's Municipal Liability Claims.

The record raises legitimate questions about the consistency and adequacy of Malvern's preparation for mental health emergencies. To establish municipal liability, however, a plaintiff must identify a municipal policy, custom, or deliberately indifferent training deficiency that was the "moving force" behind a constitutional violation. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989). It is not enough to point to evidence that additional training or better implementation might have prevented the events at issue.

Plaintiff does not contend that Malvern's written policies were themselves unconstitutional. Nor would the record support such a theory. The Malvern Police Department's Mental Health Emergencies policy directed officers to make efforts to stabilize the situation, gather relevant information, contact Crisis Intervention, and provide appropriate mental and medical resources. JS ¶ 43; PAF ¶¶ 36–37; Police Policy, Ex. M, MALVERN 000606–000607. Its Use of Force policy governed deadly and non-deadly force and provided that, "[b]efore using a firearm, police officers shall identify themselves and state their intent to shoot, where feasible." JS ¶ 42; PAF ¶ 35; Police Policy, Ex. M, MALVERN 000608–000612. Plaintiff instead argues that the Borough failed to train its officers adequately on those policies and failed to ensure that they were meaningfully implemented.

A deficient training program gives rise to municipal liability only when the deficiency reflects deliberate indifference to the constitutional rights of persons with whom officers will come into contact. *Canton*, 489 U.S. at 388–92. Ordinarily, deliberate indifference is shown through a

pattern of similar constitutional violations that places policymakers on notice that existing training is inadequate. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). In the absence of such a pattern, liability is available only in the narrow circumstance in which the need for particular training is "so obvious," and the likely constitutional consequence of failing to provide it so predictable, that the municipality's choice itself demonstrates deliberate indifference. *Id.* at 63–64; *Canton*, 489 U.S. at 390 & n.10; *Forrest v. Parry*, 930 F.3d 93, 106–09 (3d Cir. 2019).

Plaintiff has not established the usual pattern of prior violations. The record instead reflects that Malvern officers had responded to numerous mental health crises during Marcelli's tenure without a comparable use of deadly force. Marcelli Dep. 63:11–19. Plaintiff thus relies principally on the single-incident theory, arguing that officers predictably encounter high-risk mental health calls and must be trained to decide whether to maintain distance and communication or move to physical control after an apparent de-escalation.

That argument is not unreasonable. *Thomas v. Cumberland County* confirms that a municipality may be deliberately indifferent where employees repeatedly confront a dangerous and recurring situation and receive no meaningful training on how to manage it. 749 F.3d 217, 223–26 (3d Cir. 2014). Here, mental health emergencies were plainly foreseeable police work, and the record permits criticism of how Malvern translated its written policy into training.

The evidence nevertheless falls short of *Monell*'s demanding standard. Malvern did not wholly fail to address mental health encounters: it maintained a written crisis-response policy and required de-escalation training, and its officers had received general police training relevant to use of force and mental health interactions. Therefore, the asserted deficiency is not the complete absence of training in an obvious constitutional area, but the adequacy and consistency of the training that was provided. Without a pattern of similar violations, the record does not permit a

reasonable jury to infer that Borough policymakers consciously disregarded an obvious likelihood that their training choices would result in unconstitutional force.

Causation presents an additional problem. Plaintiff's strongest training evidence concerns crisis intervention, de-escalation, and the decision whether to maintain distance after Hofmann relinquished the firearm. That evidence relates most directly to Capuano's decision to pursue Hofmann, a claim on which Capuano is entitled to qualified immunity. The constitutional claim that remains for trial concerns a later and more specific decision: whether Dougherty reasonably perceived an immediate threat when he fired. Plaintiff has not identified a particular municipal training deficiency concerning the use of deadly force that is sufficiently connected to that disputed decision to permit a jury to find that Malvern's training program was the moving force behind it. The fact that different crisis tactics might have prevented the struggle altogether is insufficient, standing alone, to establish *Monell* causation.

The same shortcomings defeat any claim based on an unconstitutional custom. Plaintiff identifies no sufficiently persistent and widespread practice of mishandling mental health crises or using excessive force in such encounters that could fairly be attributed to the Borough itself. *See Forrest*, 930 F.3d at 105–06.

The Court does not minimize the gaps in Malvern's crisis response training reflected in this record. Those gaps may help explain why the encounter unfolded as it did. Section 1983, however, does not impose municipal liability whenever better training might have prevented a constitutional injury. On this record, Plaintiff has not produced evidence from which a reasonable jury could find either deliberate indifference or the causal connection *Monell* requires. The Borough is entitled to summary judgment on Plaintiff's municipal liability and failure-to-train claims.

### H. Marcelli and Dougherty Are Entitled to Summary Judgment on the Supervisory Liability Theories.

Section 1983 does not impose respondeat superior liability. A supervisor is personally liable only if he participated in the constitutional violation, directed it, or had actual knowledge of and acquiesced in the unconstitutional conduct. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). No reasonable jury could make that finding as to Marcelli. He arrived only after the shooting and did not supervise the officers at the scene beforehand. JS ¶¶ 60–61. Nor does the record establish that Marcelli possessed final and unreviewable policymaking authority over the matters at issue; he testified that Borough Council approved departmental policies. PAF ¶ 48; *see Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010).

The supervisory theory against Dougherty likewise fails. His potential liability arises from his own decision to fire. On this record, there is no basis to find that Dougherty directed Capuano to pursue or seize Hofmann; those events had already occurred by the time Dougherty reached the struggle. Summary judgment will therefore be entered for Marcelli and Dougherty on the supervisory liability claims.

### I. The Assault and Battery Claim Against Dougherty Remains for Trial.

Under Pennsylvania law, a police officer may use reasonable force in performing his duties but may be liable for assault or battery when the force used is unnecessary or excessive. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293–94 (Pa. 1994). The same factual dispute that precludes summary judgment on the Fourth Amendment claim precludes judgment here. If Dougherty reasonably perceived an uncontrolled firearm moving toward the officers, his use of force was privileged. If no immediate lethal threat existed when he fired, a jury could find the force excessive.

Statutory immunity does not alter that conclusion. The Political Subdivision Tort Claims Act does not protect an employee whose conduct constitutes willful misconduct. 42 Pa. Cons. Stat. § 8550. Willful misconduct requires more than negligence, *Renk*, 641 A.2d at 293–94, but a jury finding that Dougherty knowingly used deadly force without legal justification could satisfy that standard. Because the underlying facts remain disputed, statutory immunity cannot be resolved in Dougherty's favor at summary judgment.

**J. The Wrongful Death and Survival Claims Remain Only as to Dougherty.**

Pennsylvania's Wrongful Death and Survival Acts provide derivative remedies rather than independent bases of liability. 42 Pa. Cons. Stat. §§ 8301–8302. Given that the substantive claims against Capuano, Listmeier, Marcelli, and the Borough do not survive summary judgment, neither do the wrongful death and survival claims to the extent they depend on those defendants' conduct. The Estate may, however, pursue those remedies based on the surviving Fourth Amendment and assault-and-battery claims against Dougherty.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment will be granted in part and denied in part. Summary judgment will be entered in favor of Defendants on the Fourth Amendment claim arising from the initial knock and contact; the claim against Capuano, who is entitled to qualified immunity; the § 1983 claim against Listmeier; the ADA claims; the municipal liability and failure-to-train claims against the Borough; and the supervisory liability claims against Marcelli and Dougherty.

The motion will be denied as to the Fourth Amendment excessive-force claim against Dougherty and the related Pennsylvania assault-and-battery claim. The Wrongful Death and Survival claims may proceed only insofar as they derive from those surviving claims against Dougherty.